442 Mich. 648 (1993)
502 N.W.2d 649
In re CLAUSEN
(DeBOER
v.
SCHMIDT)
DeBOER
v.
DeBOER
Docket Nos. 96366, 96441, 96531, 96532, (Calendar Nos. 1-2).
Supreme Court of Michigan.
Argued June 3, 1993.
Decided July 2, 1993.
Dissenting opinion filed July 8, 1993.
Child Advocacy Law Clinic (by Suellyn Scarnecchia) for the petitioners-appellants Roberta and Jan DeBoer.
Victor, Robbins & Bassett (by Richard S. Victor and Scott Bassett) for Peter Darrow, next friend of plaintiff-appellee.
*653 Faupel & Associates (by Marian L. Faupel) for the respondent-appellee Daniel Schmidt.
Child Advocacy Law Clinic (by Suellyn Scarnecchia) for defendants-appellees Roberta and Jan DeBoer.
Faupel & Associates (by Marian L. Faupel) for defendants-appellants Cara and Daniel Schmidt.
Amici Curiae:
McGurn & Associates, Ltd. (by Michael McGurn), and Margaret M.S. Noe for Catholic Social Services of Lenawee County.
Tann H. Hunt and Todd W. Grant for appellants Roberta and Jan DeBoer.
Victor, Robbins & Bassett (by Richard S. Victor and Scott Bassett) for Grandparents Rights Organization.
Teressa L. Streng, Kenton W. Hambrick, and William B. Newman, Jr., for Catholic Charities of Southwestern Virginia, Inc.
Darnton, Rutzky & Dodge (by Thomas B. Darnton) for Yale University Child Study Center.
Schweitzer, Bentzen & Scherr (by Michael P. Bentzen, Robert N. Levin, Leslie Scherr, and Susan L. Biro), and Nancy Poster and Dale S. Adams for The National Council for Adoption.
Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C. (by Glenna J. Weith), and Kessler & Geer (by Barbara L. Kessler), for American Academy of Adoption Attorneys.
*654 Nannette M. Bowler and Lewis Pitts and Gayle Korotkin, for Legal Action Project of the National Committee for the Rights of the Child, et al.
Anne L. Argiroff, Ann L. Routt and Michael R. Yales, Legal Services of Southeastern Michigan, Kenneth C. Penokie, Legal Services of Northern Michigan, John Forczak, Michigan Legal Services, and Karen Gullberg Cook for Daniel and Cara Schmidt.
Peter P. Darrow, Sally Rutzky, Veronique Lerner, and Joan Lowenstein, for guardians ad litem.
Dissenting opinion by LEVIN, J., filed July 8, 1993.
PER CURIAM:
These two related cases arise out of a child custody dispute involving the competing claims of the child's natural parents (Cara and Daniel Schmidt) and the third-party custodians with whom the child now lives (Roberta and Jan DeBoer).
While we will deal at length with the various arguments marshaled in support of their claims, we sum up our analysis of the competing arguments by reference to the words of the United States Supreme Court: "No one would seriously dispute that a deeply loving and interdependent relationship with an adult and a child in his or her care may exist even in the absence of blood relationship." Smith v Organization of Foster Families, 431 US 816, 843-844; 97 S Ct 2094; 53 L Ed 2d 14 (1977). But there are limits to such claims. In the context of foster care, the Court has said:
[T]here are also important distinctions between the foster family and the natural family. First, unlike the earlier cases recognizing a right to family privacy, the State here seeks to interfere, not with a relationship having its origins entirely apart from the power of the State, but rather with *655 a foster family which has its source in state law and contractual arrangements.... [T]he liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in "this Nation's history and tradition." Here, however, whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset.
* * *
A second consideration related to this is that ordinarily procedural protection may be afforded to a liberty interest of one person without derogating from the substantive liberty of another.... It is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered, even in the absence of biological connection or state-law recognition of the relationship. It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right  an interest the foster parent has recognized by contract from the outset. [431 US 845-846.]
Likewise, the DeBoers acquired temporary custody of this child, with whom they had no prior relationship, through the power of the state and must be taken to have known that their right to continue custody was contingent on the completion of the Iowa adoption. Within nine days of assuming physical custody and less than one month after the child's birth, the DeBoers learned of Cara Schmidt's claim that the waiver of rights procured by the attorney acting on behalf of the DeBoers was unlawful because she had not been afforded the seventy-two hour waiting period required by *656 Iowa law.[1] Within two months of the child's birth, the DeBoers learned of Daniel Schmidt's claim of paternity when on March 27, 1991, he filed a petition to intervene in the DeBoers' adoption proceeding.
The State of Iowa has not arbitrarily interfered "in a family-like association freely entered." Rather, the Iowa courts have proceeded with the adoption action initiated by the DeBoers, and at the conclusion of that litigation ruled that there would be no adoption, preventing the creation of the family unit that was the objective of the adoption petition.
In Docket No. 96366,[2] we affirm the judgment of the Court of Appeals for two independent reasons. First, the Uniform Child Custody Jurisdiction Act[3] (UCCJA) and the federal Parental Kidnapping Prevention Act[4] (PKPA) deprive the Michigan courts of jurisdiction over this custody dispute and require the enforcement of the orders of the Iowa courts directing that the Schmidts have custody of the child. Second, the DeBoers lack standing to bring this custody action under our decision in Bowie v Arder, 441 Mich 23; 490 NW2d 568 (1992).
*657 In Docket Nos. 96441, 96531, and 96532[5] we vacate the orders of the Washtenaw Circuit Court and direct that the action be dismissed for failure to state a claim upon which relief may be granted. While a child has a constitutionally protected interest in family life, that interest is not independent of its parents' in the absence of a showing that the parents are unfit. In this case, in the Iowa litigation the DeBoers were unable to prove that the child's father would not be a fit parent, and no claim has been made that her mother is unfit.
I
The facts are set out at length in the opinion of the Court of Appeals. Briefly, on February 8, 1991, Cara Clausen gave birth to a baby girl in Iowa. Proceedings in Iowa have established that defendant Daniel Schmidt is the child's father. On February 10, 1991, Clausen signed a release of custody form, relinquishing her parental rights to the child. Clausen, who was unmarried at the time of the birth,[6] had named Scott Seefeldt as the father. On February 14, 1991, he executed a release of custody form.
On February 25, 1991, petitioners Roberta and Jan DeBoer, who are Michigan residents, filed a petition for adoption of the child in juvenile court *658 in Iowa. A hearing was held the same day, at which the parental rights of Cara Clausen and Seefeldt were terminated, and petitioners were granted custody of the child during the pendency of the proceeding. The DeBoers returned to Michigan with the child, and she has lived with them in Michigan continuously since then.
However, the prospective adoption never took place. On March 6, 1991, nine days after the filing of the adoption petition, Cara Clausen filed a motion in the Iowa Juvenile Court to revoke her release of custody. In an affidavit accompanying the request, Clausen stated that she had lied when she named Seefeldt as the father of the child, and that the child's father actually was Daniel Schmidt. Schmidt filed an affidavit of paternity on March 12, 1991, and on March 27, 1991, he filed a petition in the Iowa district court, seeking to intervene in the adoption proceeding initiated by the DeBoers.
On November 4, 1991, the district court in Iowa conducted a bench trial on the issues of paternity, termination of parental rights, and adoption. On December 27, 1991, the district court found that Schmidt established by a preponderance of the evidence that he was the biological father of the child; that the DeBoers failed to establish by clear and convincing evidence that Schmidt had abandoned the child or that his parental rights should be terminated; and that a best interests of the child analysis did not become appropriate unless abandonment was established. On the basis of these findings, the court concluded that the termination proceeding was void with respect to Schmidt, and that the DeBoers' petition to adopt *659 the child must be denied. Those decisions have been affirmed by the Iowa appellate courts.[7]
On remand from the Iowa Supreme Court, the district court ordered the DeBoers to appear on December 3, 1992, with the child.[8] The DeBoers did not appear at the hearing; instead, their Iowa attorney informed the court that the DeBoers had received actual notice of the hearing but had decided not to appear. In an order entered on December 3, 1992, the district court terminated the DeBoers' rights as temporary guardians and custodians of the child. The court found that
Mr. and Mrs. De[B]oer have no legal right or claim to the physical custody of this child. They are acting outside any legal claim to physical control and possession of this child.
On the same day their rights were terminated in Iowa, the DeBoers filed a petition in Washtenaw Circuit Court, asking the court to assume jurisdiction under the UCCJA. The petition requested that the court enjoin enforcement of the Iowa custody order and find that it was not enforceable, or, in the alternative, to modify it to give custody to the DeBoers. On December 3, 1992, the Washtenaw Circuit Court entered an ex parte temporary restraining order, which directed that the child remain in the custody of the DeBoers, and ordered Schmidt not to remove the child from Washtenaw County.
On December 11, 1992, Schmidt filed a motion for summary judgment to dissolve the preliminary injunction and to recognize and enforce the Iowa *660 judgment. The Washtenaw Circuit Court held a hearing on Schmidt's motion on January 5, 1993. It found that it had jurisdiction to determine the best interests of the child. It denied Schmidt's motion for summary judgment, and directed that the child remain with the DeBoers until further order of the court.[9]
On March 29, 1993, the Court of Appeals reversed[10] the Washtenaw Circuit Court's denial of Schmidt's motion for summary judgment, concluding that court lacked jurisdiction under the UCCJA, and that under our decision in Bowie v Arder, supra, the DeBoers lacked standing to bring the action. 199 Mich App 10; 501 NW2d 193 (1993).
Following the Court of Appeals decision, on April 14, 1993, a complaint for "child custody, declaratory relief, and injunctive relief" was filed in Washtenaw Circuit Court. The plaintiff was described as "Jessica DeBoer (a/k/a Baby Girl Clausen), by her next friend, Peter Darrow." Mr. Darrow, a Washtenaw County attorney, had been appointed as one of the co-guardians ad litem for the child in the earlier custody case. On that date, the Washtenaw Circuit Court entered an order appointing Darrow as next friend in the new action, and an order to show cause directing the *661 DeBoers and Schmidts to appear on April 22. The latter included language that pending that hearing, "the minor child's residence status quo shall be maintained." At the hearing on April 22, after hearing argument by counsel for the Schmidts and the DeBoers, the circuit court entered an "order continuing status quo." It provided, in part:
1. The status quo as to the residence of the Plaintiff, Jessica DeBoer, with Defendants, Roberta and Jan DeBoer shall be maintained during the pendency of this action or until further order of this Court, or any appellate court.
2. Counsel for the parties, and all other interested persons, if they obtain permission from the Court, may file briefs on the legal and constitutional issues raised by this action within 21 days from the date of this Order.
On April 27, 1993, the Schmidts filed an application for leave to appeal to the Court of Appeals. They also filed an application for leave to appeal to this Court before decision by the Court of Appeals under MCR 7.302(C)(1). On May 6, 1993, we granted the DeBoers' application in Docket No. 96366,[11] and the Schmidts' application for leave to appeal before decision by the Court of Appeals in Docket Nos. 96441, 96531, and 96532.[12] 442 Mich 903.
II
Interstate enforcement of child custody orders *662 has long presented vexing problems. This arose principally from uncertainties about the applicability of the Full Faith and Credit Clause of the United States Constitution.[13] Because custody decrees were generally regarded as subject to modification, states had traditionally felt free to modify another state's prior order.[14]
The initial attempt to deal with these jurisdictional problems was the drafting of the Uniform Child Custody Jurisdiction Act, promulgated by the National Conference of Commissioners on Uniform State Laws in 1968. 9 ULA 123. That uniform act has now been enacted, in some form, in all fifty states, the District of Columbia, and the U.S. Virgin Islands. The Michigan version of the act is found at MCL 600.651 et seq.; MSA 27A.651 et seq. The act provides standards for determining whether a state may take jurisdiction of a child custody dispute,[15] and sets forth the circumstances *663 in which the courts of other states are prohibited from subsequently taking jurisdiction,[16] are required to enforce custody decisions of the original state,[17] and are permitted to modify such decisions.[18]
*664 Despite the widespread enactment of the UCCJA, variations in the versions adopted in some states, and differing interpretations, resulted in continuing uncertainty about the enforceability of custody decisions.[19] In 1980, Congress responded by adopting the Parental Kidnapping Prevention Act,[20] 28 USC 1738A. The PKPA "imposes a duty on the States to enforce a child custody determination entered by a court of a sister State if the determination is consistent with the provisions of the Act." Thompson v Thompson, 484 US 174, 175-176; 108 S Ct 513; 98 L Ed 2d 512 (1988). The PKPA includes provisions similar to the UCCJA, and emphatically *665 imposes the requirement that sister-state custody orders be given effect.[21]
III
In its March 29, 1993, opinion, the Court of Appeals agreed with Daniel Schmidt that the *666 Washtenaw Circuit Court lacked jurisdiction to modify the Iowa custody orders and was instead required to enforce them. It explained:
Schmidt asserts that pursuant to the Full Faith and Credit Clauses in both the United States Constitution, US Const, art IV, § 1, and the UCCJA, MCL 600.663; MSA 27A.663, the Washtenaw Circuit Court was obligated to recognize and enforce the valid judgment from Iowa. Iowa exercised jurisdiction, entered a judgment, and retained jurisdiction. Iowa has continued to exercise jurisdiction throughout, even to holding the DeBoers in contempt of court.
We find that the Washtenaw Circuit Court lacked jurisdiction to intervene in this case. The UCCJA has been enacted by every state, including Michigan. See 1975 PA 297. Its primary purpose is to avoid jurisdictional competition between states by establishing uniform rules for deciding when states have jurisdiction to make child custody determinations. MCL 600.651; MSA 27A.651. Pursuant to § 656(1) of the UCCJA, MCL 600.656(1); MSA 27A.656(1), Michigan is precluded from exercising jurisdiction if a matter concerning custody is pending in another state at the time the petition to modify is filed in this state. See Moore v Moore, 186 Mich App 220, 226; 463 NW2d 230 (1990). An adoption proceeding is included in the definition of a custody proceeding under the UCCJA. MCL 600.652(c); MSA 27A.652(c). Foster v Stein, 183 Mich App 424, 430; 454 NW2d 244 (1990). The DeBoers filed their petition in Washtenaw Circuit Court on December 3, 1992. On that date the Iowa district court entered an order terminating the DeBoers' rights as temporary guardians and custodians of [the child], and scheduled a hearing for the DeBoers to show cause why they should not be held in contempt. Although the issues concerning the dismissal of the DeBoers' adoption petition and the right to physical custody of [the child] had been determined by the Iowa Supreme Court before December 3, 1992, further proceedings were *667 scheduled in the case. Under § 656(1) of the UCCJA, the Washtenaw Circuit Court was precluded from intervening in this case, and was obligated to recognize and enforce the Iowa order of December 3, 1992. US Const, art IV, § 1; MCL 600.663; MSA 27A.663.
We find that the DeBoers' contention that a Michigan court could modify the Iowa order because Iowa did not act substantially in conformity with the UCCJA by doing a "best interests of the child" analysis is without merit. The Iowa court dismissed the adoption petition and granted custody of [the child] to Schmidt because he was the biological father of the child and because his parental rights had not been terminated. The Iowa court found that Iowa statutes and case law did not require the type of best interests analysis sought by the DeBoers in Michigan unless statutory grounds for termination had been established. [199 Mich App 17-19.]
IV
A
The DeBoers argue that the Iowa custody orders were subject to modification by Michigan courts because the Iowa proceedings were no longer "pending" under the UCCJA at the time the Washtenaw Circuit Court action was filed on December 3, 1992. They point to Ford Motor Co v Jackson, 47 Mich App 700; 209 NW2d 794 (1973), for the proposition that an action is no longer pending once a final determination has been made on appeal. They maintain that when the Iowa Supreme Court affirmed the judgment awarding custody to the natural father on September 23, 1992, and thereafter denied the DeBoers' request for rehearing, that made the decree final, and therefore modifiable. The only remaining matters *668 in Iowa were hearings to enforce the final order. They maintain that such enforcement proceedings do not involve custody issues, and thus the proceeding with regard to custody was no longer pending.
We reject the DeBoers' construction of the UCCJA.[22] Enforcement of the Iowa decision is required by the PKPA,[23] and therefore a detailed *669 analysis of the UCCJA is not required.
The congressionally declared purpose of the PKPA is to deal with inconsistent and conflicting laws and practices by which courts determine their jurisdiction to decide disputes between persons claiming rights of custody. Inconsistency in the determination by courts of their jurisdiction to decide custody disputes contributes to
the disregard of court orders, excessive relitigation of cases, [and] obtaining of conflicting orders by the courts of various jurisdictions.... [PL 96-611, § 7(a)(3), 94 Stat 3569.]
Congress also recognized that
among the results of those conditions and activities are the failure of the courts of such jurisdictions to give full faith and credit to the judicial proceedings of the other jurisdictions ... and harm to the welfare of children and their parents and other custodians. [PL 96-611, § 7(a)(4), 94 Stat 3569.]
For these reasons, among others, Congress declared that the best interests of the child required the establishment of a uniform system for the assumption of jurisdiction to
(3) facilitate the enforcement of custody and visitation decrees of sister States;
(4) discourage continuing interstate controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;

*670 (5) avoid jurisdictional competition and conflict between State courts in matters of child custody and visitation which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being. [Id., § 7(c)(3)-(5).]
The suggestion that in this context the best interests purpose of the PKPA mandates a best interests analysis in Iowa, failing which the Iowa decision is not entitled to full faith and credit, would permit the forum state's view of the merits of the case to govern the assumption of jurisdiction to modify the foreign decree. It also suggests that Congress intended to impose the substantive best interests rule in all custody determinations on the laws of the fifty states.[24] This interpretation is in conflict with the directive of Congress that "[t]he appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided ... any child custody determination made consistently with the provisions of this section by a court of another State." 28 USC 1738A(a).
*671 It has been aptly noted that the vulnerability of a custody decree to an out-of-state modification presented the greatest need of all for the reform effort of the PKPA. "In language that is subject to little or no misinterpretation the jurisdiction of the initial court continues to the exclusion of all others as long as that court has jurisdiction under the law of that state and the state remains the residence of the child or any contestant." Baron, Federal preemption in the resolution of child custody jurisdiction disputes, 45 Ark L R 885, 901 (1993).
Certainty and stability are given priority under the PKPA, which gives the home state exclusive continuing jurisdiction. Thus, the PKPA expressly provides that if a custody determination is made consistently with its provisions, "[t]he appropriate authorities of every State shall enforce [it] according to its terms, and shall not modify" that custody decision. 28 USC 1738A(a) (emphasis added). "A child custody determination ... is consistent with the provisions [of the PKPA] only if" the court making the determination had jurisdiction under its own laws, and the state was the "home state" of the child when the proceedings were commenced. 28 USC 1738A(c)(1). At the time of commencement of both the termination and adoption proceedings, Iowa unquestionably had jurisdiction under its own laws and Iowa was unquestionably the home state of the child. Thus, the child custody determination made by the Iowa court was made consistently with the provisions of the PKPA.
Where the custody determination is made consistently with the provisions of the PKPA, the jurisdiction of the court that made the decision is exclusive and continuing as long as that state "remains the residence of the child or of any contestant," and it still has jurisdiction under its *672 own laws.[25] 28 USC 1738A(d). Unquestionably, Daniel Schmidt continues to reside in Iowa. Furthermore, Iowa law provides for continuing jurisdiction in custody matters,[26] and the Iowa courts regarded themselves as continuing to have jurisdiction of the custody proceeding because they continued to issue orders in the case: the order of December 3, 1992, terminating the DeBoers' right to custody and appointing Daniel Schmidt as custodian, and the order of January 27, 1993, holding the DeBoers in contempt. Because the Iowa custody determination was made consistently with the terms of the PKPA, and because Iowa's jurisdiction *673 continues, the Iowa court's order must be enforced.
The courts of this state may only modify Iowa's order if Iowa has declined to exercise its jurisdiction to modify it. 28 USC 1738A(f). Iowa has not declined to exercise its jurisdiction to modify its custody order; it has simply declined to order the relief sought by the DeBoers. Modification is not permitted on these facts:[27] Iowa continues to have jurisdiction, it has not declined to exercise that jurisdiction, its jurisdiction is, therefore, exclusive, and Iowa's exclusive continuing jurisdiction precludes the courts of this state from exercising jurisdiction to modify the Iowa order.
The UCCJA and the PKPA are legislative responses to the concerns expressed by Justice Jackson regarding the failure to recognize a custody judgment of a sister state. "A state of the law such as this, where possession is not merely nine points of the law but all of them and self-help the ultimate authority, has little to commend it in legal logic or as a principle of order in a federal system."[28] However, the uniformity of decisions contemplated by Congress cannot be realized if "judicial homestate favoritism and the substitution of `the best interest of the child' inquiry for jurisdictional inquiry ... promote continuing custody litigation...." Blakesley, Child custody  jurisdiction and procedure, 35 Emory L J 291, 359 (1986).
The PKPA does indeed preempt state law in the resolution of jurisdictional disputes. Initial custody jurisdiction is limited to just one forum  the home state. Modification jurisdiction is exclusively reserved *674 to the court that rendered the initial decree. Notice and opportunity to be heard must be given prior to a custody determination. Sister states are required to enforce those decrees and give them full faith and credit. Sister states are prohibited from interfering with those courts which are properly asserting jurisdiction.
* * *
Custody litigation is full of injustice  let there be no doubt about that. No system of laws is perfect. Consistency in the application of the laws, however, goes a long way toward curing much of the injustice. While the laws of the fifty states may vary as to the substantive rules in custody determinations, at least there is a uniform standard imposed equally on all the states by the PKPA for determining which court makes that determination. The PKPA and its preemptive effect can no longer be avoided. [Baron, supra at 912.]
B
The DeBoers argue that the Iowa judgment should not be enforced because the Iowa courts did not conduct a hearing into the best interests of the child in making the custody decision. They maintain that this undercuts the Iowa decision in two respects. First, they say this means that the Iowa decision was not in conformity with the UCCJA,[29] and therefore not entitled to enforcement under *675 that statute.[30] Second, they believe that the Iowa proceeding was repugnant to Michigan public policy.
We reject the contention that the decision of the Iowa courts not to conduct a best interests of the child hearing in the circumstances of this case justifies the refusal to enforce the Iowa judgments.[31]
The UCCJA and the PKPA are procedural statutes. To be sure, they express the purpose of assuring that the state that is in the best position to make *676 a proper determination regarding custody of the child be the one in which the action is brought, and that other states will follow the decision made there. That purpose has been achieved in this case. There can be no doubt that at the time the Iowa proceedings commenced in February 1991, that state was the appropriate one to take jurisdiction; it was in the best position to resolve the issues presented. As was conceded by counsel for the DeBoers during oral argument, the statutes do not provide that a best interests of the child standard is the substantive test by which all custody decisions are to be made. Each state, through legislation and the interpretative decisions of its courts, is free to fashion its own substantive law of family relationships within constitutional limitations.
Further, we do not find the Iowa proceedings to be so contrary to Michigan public policy as to require us to refuse to enforce the Iowa judgments. Before turning to Michigan public policy, however, a preliminary matter must be examined.
After passage of the PKPA, we are not free to refuse to enforce the Iowa judgment as being contrary to public policy. That statute says:
The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State. [28 USC 1738A(a).]
Subsection (f) does not provide a basis for declining to enforce the Iowa order. For the first time at oral argument, the DeBoers asserted that the order was not made consistently with the PKPA. As they contended regarding the UCCJA, they think an order is not made consistently with the statute if a best interests of the child test is not used. However, *677 they point to no provision of the statute with which the Iowa courts did not comply, and they cite no authority for their interpretation of the PKPA.
Turning to the matter of Michigan public policy, while in many custody disputes Michigan does apply a best interests of the child test, there are circumstances in which we do not. For example, § 39 of the Adoption Code has a pair of provisions regarding the termination of parental rights of putative fathers who seek custody of a child:
(1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interest of the child to grant custody to the putative father, the court shall terminate his rights to the child.
(2) If the putative father has established a custodial relationship with the child or has provided support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter[[32]] or section 2 of chapter XIIA.[[33]] [MCL 710.39; MSA 27.3178(555.39).]
There will be many cases in which the putative *678 father meets the conditions that bring him within subsection 2, but in which someone else could make a persuasive showing that the best interests of the child require denying the father custody. Nevertheless, under the statute, the best interests standard of subsection 1 would not apply.[34]
Similarly, in the case of limited guardianships, if the hearing establishes that the parent or parents have substantially complied with a limited guardianship placement plan, the court is required to terminate the guardianship without using the best interests test that is applied where there has not been such compliance. MCL 700.424c(3); MSA 27.5424(3)(3). This is so even if the guardian could prevail on a best interests standard.
Finally, under Michigan law where a party has no legally cognizable claim to custody of a child, there is no right to a best interests hearing. E.g., Ruppel v Lesner, 421 Mich 559; 364 NW2d 665 (1984); Bowie v Arder, supra.
We express no opinion about whether we would require a Michigan court to hold a best interests of the child hearing if we were faced with the circumstances presented to the Iowa courts. However, we cannot hold that the Iowa judgment is unenforceable under the UCCJA and PKPA because such a hearing was not held.
V
The Court of Appeals also concluded that the DeBoers lacked standing to claim custody of the child. The Court said:
We hold that the DeBoers lacked standing to bring this action in Washtenaw Circuit Court. The *679 Iowa district court order of December 3, 1992, implemented the decision of the Iowa Supreme Court and stripped the DeBoers of any legal claim to custody of [the child]. The grant of temporary custody was rescinded. At that time, the DeBoers became third parties with respect to [the child], and no longer had a basis on which to claim a substantive right to custody. Bowie, supra at 43-45, 49, states that neither the Child Custody Act[[35]] nor "any other authority" gives standing to create a custody dispute to a third party who does not possess a substantive right to custody or is not a guardian. A right to legal custody cannot be based on the fact that a child resides or has resided with the third party. We take the reference in Bowie, supra at 45, to "any other authority" to include the UCCJA.
The DeBoers' argument that Bowie, supra, does not apply to this case is without merit. As noted, the pronouncement in Bowie, supra, regarding the standing of third parties to create custody disputes is expressly not limited to actions brought under the Child Custody Act. Moreover, contrary to the DeBoers' assertions, they have created a custody dispute by filing a petition in Washtenaw Circuit Court. The Iowa Supreme Court decision, implemented by the Iowa district court's order of December 3, 1992, dismissed the DeBoers' petition to adopt [the child] and rescinded their status as temporary guardians and custodians. The DeBoers had no further legal rights to [the child]. The DeBoers have attempted to use the UCCJA and the Washtenaw Circuit Court to create anew a right that the Iowa courts had extinguished. The DeBoers initiated a custody dispute in this state. Pursuant to Bowie, supra, they had no standing to do so. To disavow Bowie in this case would give an advantage to third parties in interstate custody disputes that is not enjoyed by third parties in intrastate disputes.
The DeBoers' reliance on In re Danke, 169 Mich App 453; 426 NW2d 740 (1988), and In re Weldon, *680 397 Mich 225; 244 NW2d 827 (1976) (cases in which third parties with no legal right to custody were granted standing to bring a custody action), is misplaced. Both cases were decided before Bowie, supra. The Bowie Court specifically stated that Weldon, supra, was overruled, and that a third party could not gain standing simply by filing a complaint and asserting that a change in custody would be in the best interests of the child. Bowie, supra at 48-49. [199 Mich App 19-21.]
VI
The DeBoers advance a variety of arguments in support of their claim that they have standing to litigate regarding the custody of the child.[36] First, they argue that the UCCJA grants them standing, pointing particularly to two of the jurisdictional provisions in § 653(1).[37]
*681 The DeBoers also argue that Bowie v Arder does not deny them standing. To begin with, they think that Bowie let stand statements in the lower court decision to the effect that "once judicial intervention has already taken place, the court may award custody to third parties." 190 Mich App 571, 573; 476 NW2d 649 (1991). Further, they see the only prohibition as being on the ability of a third party to create a custody dispute. In their view, judicial intervention in this dispute began over two years ago, and they did not create the dispute. The initial decree in Iowa resulted from Schmidt's creation of a custody dispute when he filed a petition for intervention on March 27, 1991. Their filing of the petition in Michigan was a response to and an effort to modify the Iowa custody decree dissolving their right to custody of the child.
Further, the DeBoers believe that Bowie is inapplicable because it is a case dealing with the Child Custody Act. This is a UCCJA action in which the Child Custody Act's provisions regarding best interests of the child are only incidentally involved. Even Bowie recognized that kind of incidental use of the Child Custody Act.
In addition Bowie said that a circuit court has the power to grant custody to "third parties according to the best interests of the child in an appropriate case (typically involving divorce)" and that "such an award of custody is based not on the third party's legal right to custody of the child, but on the court's determination of the child's best interests." 441 Mich 49, n 22.
Finally, the DeBoers assert that despite Bowie they had a substantive right to custody because they had custody pursuant to the February 25, 1991, order of the Iowa district court.
*682 In addition, the DeBoers maintain that there is a protected liberty interest in their relationship with the child, which gives them standing. They trace the recent history of constitutional protection of parental rights beginning with Stanley v Illinois, 405 US 645; 92 S Ct 1208; 31 L Ed 2d 551 (1972), through Quilloin v Walcott, 434 US 246; 98 S Ct 549; 54 L Ed 2d 511 (1978), Smith v Organization of Foster Families, 431 US 816; 97 S Ct 2094; 53 L Ed 2d 14 (1977), and Lehr v Robertson, 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983), to Michael H v Gerald D, 491 US 110; 109 S Ct 2333; 105 L Ed 2d 91 (1989). From these cases, they extract the principles that it is the relationship between the parent and child that triggers significant constitutional protection and that the mere existence of a biological link is not determinative.
We reject these arguments. As the Court of Appeals noted, Bowie was not limited to Child Custody Act cases. The UCCJA is a procedural statute governing the jurisdiction of courts to entertain custody disputes. It is not enough that a person assert to be a "contestant" or "claim" a right to custody with respect to a child. If that were so, then any person could obtain standing by simply asserting a claim to custody, whether there was any legal basis for doing so or not. The Court of Appeals has correctly read our decision in Bowie as requiring the existence of some substantive right to custody of the child. We adhere to the holding of Bowie that a third party does not obtain such a substantive right by virtue of the child's having resided with the third party. 441 Mich 43.[38]
We also agree with the Court of Appeals rejection of the DeBoers' arguments regarding the "creation" *683 of a dispute and that they only seek to modify the Iowa order. It is true that Bowie recognized the incidental application of the Child Custody Act standards in other kinds of actions  typically divorce cases. However, the problem with the DeBoers' reasoning is that there is no action that they are entitled to bring to which the Child Custody Act can be applied incidentally.
It may be that the Iowa district court's February 25, 1991, order appointing the DeBoers as custodians during the pendency of the Iowa adoption proceeding was sufficiently analogous to a Michigan guardianship (which would create standing)[39] to have given them standing to prosecute a custody action during the effectiveness of that order. However, as the Court of Appeals said, when the temporary custody order was rescinded, they became third parties to the child and no longer had a basis on which to claim a substantive right of custody.[40]
The United States Supreme Court cases on which the DeBoers rely do not establish that they have a federal constitutional right to seek custody of the child. None involved disputes between a natural parent or parents on one side and non-parents on the other. While some of those cases place limits on the rights of natural parents, particularly unwed fathers, they involve litigation pitting one natural parent against the other, in which, almost of necessity, one natural parent *684 must be denied rights that otherwise would have been protected. Sometimes a nonparent in a sense "prevails" in such actions, but that has been in the context of adoption by a stepfather who is married to the child's natural mother[41] or legitimization of the status of the natural mother's husband, who is not the biological father.[42]
Several of the cases talk about an unwed father's rights as being dependent on the development of a relationship with the child. We read those decisions as providing the justification for denying the unwed father's rights, rather than as establishing that nonparent custodians obtain such rights merely by having custody. Further, as the Iowa district court noted after reviewing these United States Supreme Court cases:
It is therefore now clearly established that an unwed father who has not had a custodial relationship with a child nevertheless has a constitutionally protected interest in establishing that relationship.
And, as the Iowa Supreme Court concluded:
We agree with the district court that abandonment was not established by clear and convincing evidence. In fact, virtually all of the evidence regarding Daniel's intent regarding this baby suggests just the opposite: Daniel did everything he could reasonably do to assert his parental rights, beginning even before he actually knew that he was the father.[[43]]
*685 VII
In Docket Nos. 96441, 96531, and 96532, the next friend for the child argues that we should recognize the right of a minor child to bring a Child Custody Act action and obtain a best interests of the child hearing regarding her custody. Because of the interrelationship of this action to the DeBoers' application for leave to appeal in Docket No. 96366, we granted leave to appeal before decision by the Court of Appeals and directed the parties to brief the question whether the action should be dismissed for failure to state a claim upon which relief may be granted. Basically, the next friend advances three theories on which a child is entitled to bring such an action.
First, the next friend maintains that the Child Custody Act gives children the right to bring such actions. MCL 722.24; MSA 25.312(4), says that in actions under the act, "the court shall declare the inherent rights of the child." The next friend asserts that there is nothing in the act that would deprive the child of the right to bring an action.
Second, the next friend maintains that the child has a due process liberty interest in her relationship with the DeBoers. Cases in other contexts are cited for the proposition that children are "persons" under the constitution and that constitutionally protected liberty interests run both to adults and minors. E.g., In re Gault, 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967); Planned Parenthood v Danforth, 428 US 52; 96 S Ct 2831; 49 L Ed 2d 788 (1976); Tinker v Des Moines Independent Community School Dist, 393 US 503; 89 S Ct 733; 21 L Ed 2d 731 (1969). The next friend reiterates the arguments *686 made by the DeBoers that cases such as Lehr v Robertson and Smith v Organization of Foster Families establish that the liberty interest in family life arises out of relationships based on day-to-day contact and not on biological relationships.
Third, the next friend argues that the child is denied equal protection on two grounds. First, children are treated differently on the basis of whether they are in the custody of "psychological" parents rather than a biological parent. Second, the Child Custody Act grants some children residing with third-party custodians the right to a best interests hearing (those living with court-appointed guardians), but not others.
We do not believe that the Child Custody Act can be read as authorizing such an action.[44] The act's consistent distinction between the "parties" and the "child" makes clear that the act is intended to resolve disputes among adults seeking custody of the child.
It is true that children, as well as their parents, have a due process liberty interest in their family life. However, in our view those interests are not independent of the child's parents. The Legislature has provided a right of parental custody and control of children:
Unless otherwise ordered by a court order, the *687 parents[[45]] of an unemancipated minor are equally entitled to the custody, control, services and earnings of the minor, but if 1 parent provides, to the exclusion of the other parent, for the maintenance and support of the minor, that parent has the paramount right to control the services and earnings of the minor. [MCL 722.2; MSA 25.244(2).]
The mutual rights of the parent and child come into conflict only when there is a showing of parental unfitness.[46] As we have held in a series of cases, the natural parent's right to custody is not to be disturbed absent such a showing, sometimes despite the preferences of the child.
In Burkhardt v Burkhardt, 286 Mich 526; 282 NW 231 (1938), the child was one year old at the time of his parents' divorce. The mother was awarded custody, but voluntarily placed the child with third parties. Several years later, the mother took custody of the child. The father obtained an order giving him legal custody, but directing that the child actually be in the care of the third *688 parties. We reversed, awarding custody to the mother:
It is a well-established principle of law, too well grounded to need citation of authority, that the parents, whether rich or poor, have the natural right to the custody of their children, subject to judicial control only when the safety or interests of the child demand it.... The choice of a child of the tender age of four years cannot be considered by the court in its determination of what disposition shall be made of the case. [286 Mich 534-535.]
Liebert v Derse, 309 Mich 495; 15 NW2d 720 (1944), involved the custody of a six year old. He had been legally adopted by a couple. His adoptive mother died when the child was two years old, and the adoptive father temporarily placed him with the child's aunt. Several years later, when the child was six, he objected to returning to his father, who petitioned for habeas corpus, seeking return of the child. The trial court declined to disturb the "wholesome and happy surroundings" of custody with the aunt. We reversed:
We recognize the long-established rule that the best interest of the child is of paramount importance, ... and that it is our judicial duty to safeguard his welfare and care.... However, we never have interpreted such rule so as to deprive a parent of the custody of his or her child, unless it was shown that the parent was an unsuitable person to have such custody.
* * *
When placed on the witness stand, the boy said, in substance, that he thought his father would be good to him but that he preferred to stay with defendants. Such preference was the natural desire of a small child to remain in the environment *689 to which he had become accustomed. While his wishes are entitled to consideration, it is clear that a six-year-old child is hardly competent to determine what environment and whose custody are best for his present and future welfare. Furthermore, his present wish to remain with defendants cannot overrule the established legal right of his father to his custody. [309 Mich 500-504.]
In Riemersma v Riemersma, 311 Mich 452; 18 NW2d 891 (1945), the child had lived with her grandparents since she was two years old. Two years later, the mother took her back, and the grandparents brought an action for custody. After quoting from Liebert v Derse, we held the mother entitled to custody:
There was no allegation or showing that the mother was not a suitable person to have the custody of her infant daughter. In the absence of such a showing, she was ... clearly entitled to the child's custody. [311 Mich 462.]
Finally, in Herbstman v Shiftan, 363 Mich 64; 108 NW2d 869 (1961), the natural father placed his one and one-half-year-old daughter with relatives of his deceased wife. Three and one-half years later he sought to have the child returned to him. We summarized the applicable principles:
It is a well-established principle of law that the parents, whether rich or poor, have the natural right to the custody of their children. The rights of parents are entitled to great consideration, and the court should not deprive them of custody of their children without extremely good cause. A child also has rights, which include the right to proper and necessary support; education as required by law; medical, surgical, and other care necessary for his health, morals, or well-being; the right to proper custody by his parents, guardian, *690 or other custodian; and the right to live in a suitable place free from neglect, cruelty, drunkenness, criminality, or depravity on the part of his parents, guardians, or other custodian. It is only when these rights of the child are violated by the parents themselves that the child becomes subject to judicial control. [363 Mich 67-68.]
Despite the limited contact that the father had had with the child during the years, we reversed the trial court and awarded custody to him.
Nothing in the more recent United States Supreme Court decisions requires a different result.[47] Indeed, several of its decisions emphasize the limitations on minors' rights to independently assert rights regarding their custody and care. Michael H v Gerald D, supra; Parham v J R, 442 US 584; 99 S Ct 2493; 61 L Ed 2d 101 (1979).
In the Iowa proceedings, a challenge to Daniel Schmidt's fitness was vigorously prosecuted by the DeBoers, and they failed to prove that he was unfit. That determination is no longer challenged.
We also disagree with the next friend's assertion that the child's interests were not considered in Iowa. A guardian ad litem was appointed before Daniel Schmidt moved to intervene in the action. We have no reason to believe that the guardian ad litem's advice to the court was anything but a good-faith effort to advise regarding the interests of the child. While that proceeding did not use the "best interests of the child" standard that the next friend and the DeBoers prefer, there is no basis for requiring use of that standard.[48]
*691 With regard to the equal protection arguments, we reject the view that children residing with their parents are similarly situated to those residing with nonparents; as just explained, the relationship between natural parents and their children is fundamentally different than that between a child and nonparent custodians. Nor does the Child Custody Act's exception for guardians deny equal protection. Children living with guardians and those living with other third-party custodians are also not similarly situated. The safeguards in the guardianship statute provide protection against manipulative attempts to temporarily obtain possession and use that as the basis for a Child Custody Act action.
VIII
In Docket No. 96366, we affirm the judgment of the Court of Appeals, and in Docket Nos. 96441, 96531, and 96532, we remand the case to the Washtenaw Circuit Court with directions that the action be dismissed for failure to state claims upon which relief may be granted. The clerk is directed to issue the judgment orders forthwith. Pursuant to MCR 7.317(C)(3), the filing of a motion for *692 rehearing will not stay enforcement of the judgments.
We direct the Washtenaw Circuit Court to enter an order enforcing the custody orders entered by the Iowa courts. In consultation with counsel for the Schmidts and the DeBoers, the circuit court shall promptly establish a plan for the transfer of custody, with the parties directed to cooperate in the transfer with the goal of easing the child's transition into the Schmidt home. The circuit court shall monitor and enforce the transfer process, employing all necessary resources of the court, and shall notify the clerk of this Court 21 days following the release of this opinion of the arrangements for transfer of custody. The actual transfer shall take place within 10 days thereafter.
To a perhaps unprecedented degree among the matters that reach this Court, these cases have been litigated through fervent emotional appeals, with counsel and the adult parties pleading that their only interests are to do what is best for the child, who is herself blameless for this protracted litigation and the grief that it has caused.[49] However, the clearly applicable legal principles require that the Iowa judgment be enforced and that the child be placed in the custody of her natural parents. It is now time for the adults to move beyond saying that their only concern is the welfare of the child and to put those words into action by assuring that the transfer of custody is accomplished *693 promptly with minimum disruption of the life of the child.
CAVANAGH, C.J., and BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred.
The following opinion was filed with the Clerk of the Supreme Court on July 8, 1993, after the release of the opinion of the Court on July 2, 1993  REPORTER.
LEVIN, J. (dissenting).
I would agree with the majority's analysis if the DeBoers had gone to Iowa, purchased a carload of hay from Cara Clausen, and then found themselves in litigation in Iowa with Daniel Schmidt, who also claimed an interest in the hay. It could then properly be said that the DeBoers "must be taken to have known"[1] that, rightly or wrongly, the Iowa courts might rule against them, and they should, as gracefully as possible,[2] accept an adverse decision of the Iowa courts. Michigan would then have had no interest in the outcome, and would routinely enforce a decree of the Iowa courts against the DeBoers.
But this is not a lawsuit concerning the ownership, the legal title, to a bale of hay. This is not the usual A v B lawsuit; Schmidts v DeBoers, or, if you prefer, DeBoers v Schmidts.
There is a C, the child, "a feeling, vulnerable, and [about to be] sorely put upon little human being":[3] Baby Girl Clausen, also known as Jessica DeBoer, who will now be told, "employing all necessary resources of the [Washtenaw Circuit] [C]ourt," that she is not Jessie, that the DeBoers are not Mommy and Daddy, that her name is *694 Anna Lee Schmidt,[4] and that the Schmidts, whom she has never met, are Mommy and Daddy. This child might, indeed, as the circuit judge essentially concluded, have difficulty trying that on for size at two and one-half years, she might, indeed, suffer an identity crisis. The judge said:
We had different degrees of testimony from the experts. All the way from permanent, serious damage, she would never recover from, down to the child would recover in time. But every expert testified that there would be serious traumatic injury to the child at this time. [Emphasis added.][[5]]
A
The majority's analysis, that the DeBoers should have known when they filed their petition for adoption in Iowa that they might lose, overlooks that the child did not choose to litigate in Iowa, over four hundred miles from her only home, the legal and factual issues that would decide whether her world would be destroyed, and know that she might lose.
A leading commentator, Professor Homer H. Clark, Jr., suggests that the preferable jurisdiction for adoption is the child's home state[6] and, thus, not necessarily the home state of a biological parent.
*695 B
The well-established standard for resolving custody disputes between biological parents is the best interests of the child.[7] Many courts apply essentially the same standard for resolving custody disputes between biological parents and third parties, persons who have had actual physical custody of a child for an extended period of time.[8] Chief Judge Charles D. Breitel, speaking for the New York Court of Appeals, expressed it well:

The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude .... [Bennett v Jeffreys, 40 NY2d 543, 546; 387 NYS2d 821; 356 NE2d 277 (1976). Emphasis added.]
Other courts adhere to the "parental right" theory, and generally, in a dispute between a parent and a third-party custodian, award custody to the parent unless the parent is unfit.[9] Professor Clark criticizes the rigidity of that approach:
The parental right doctrine has acquired rigidity *696 from the dubious and amorphous principle that the natural parent has some sort of constitutional "right" to the custody of his child. This principle comes dangerously close to treating the child in some sense as the property of his parent, an unhappy analogy which the Supreme Court has been guilty of in another context.
* * *
There would not be insuperable obstacles to the development of workable principles in these cases if the courts could manage to avoid doctrinaire statements about parental rights. In general this would require recognition that the child's welfare is the principle guiding the process of decision, but in addition that the emotional and psychological advantages to the child of a parent's care should be placed high in the scale of factors which contribute to that welfare. The application of these principles should vary with the specific type of case before the court.[[10]]
*697 The majority's analysis focusing on the contest between the Schmidts and the DeBoers for possession of the child misfocuses on whether biological parents or persons acting as parents have the better "legal right," better legal title, not to a carload of hay, but to a child.[11] The focus of the Parental Kidnapping Protection Act is not on the interests of the contestants  parents or persons acting as parents  but, rather, on the best interests of the child.
C
The superior claim of the child to be heard in this case is grounded not just in law, but in basic human morality. Adults like the Schmidts and the DeBoers make choices in their lives, and society holds them responsible for their choices. When adults are forced to bear the consequences of their *698 choices, however disastrous, at least their character and personality have been fully formed, and that character can provide the foundation for recovery, the will to go on.
The character and personality of a child two and one-half years old is just beginning to take shape. To visit the consequences of adult choices upon the child during the formative years of her life, and to force her to sort out the competing emotional needs of the Schmidts and DeBoers, is unnecessarily harsh and without legal justification. The PKPA does not require this result.
The PKPA was enacted to protect the child.[12] This Court, by ignoring obvious issues concerning the welfare of the child and by focusing exclusively on the concerns of competing adults, as if this were a dispute about the vesting of contingent remainders, reduces the PKPA to a robot of legal formality with results that Congress did not intend.
D
The motif of the majority opinion is that the PKPA made us do it, that this Court had no choice consistent with the "law."[13] That thesis ignores the legislative history of the PKPA[14] and judicial decisions that construe the PKPA. The PKPA does not oblige this Court to turn its back on the child.
The majority rejects the rationale[15] of EEB v *699 DA, 89 NJ 595; 446 A2d 871 (1982), cert den sub nom Angle v Bowen, 459 US 1210; 103 S Ct 1203; 75 L Ed 2d 445 (1983). The New Jersey Supreme Court, in the context of an adoption that failed because parental rights were not duly terminated, ruled that prospective adoptive parents should retain custody of the child in preference to the biological parent because that was in the child's best interests.
The majority states that the approach of the New Jersey Supreme Court in EEB "would form the basis for an opportunity to relitigate best interests."[16] (Emphasis added.) EEB does not, however, provide an opportunity for "relitigation" of best interests; EEB, as stated by the majority, declined to enforce the Ohio custody decree because the Ohio court "did not conduct a hearing using a best interests of the child test."[17] (Emphasis added.)
This Michigan litigation is not relitigation. The DeBoers accept the Iowa court's determination that Daniel Schmidt is the biological father and do not contest the decision to restore Cara Schmidt's parental rights. They seek, rather, to litigate, for the first time, whether transferring custody of the child to the Schmidts is in her best interests.
EEB is one of two state supreme court decisions in which the court considered the issue whether a state is obliged by the PKPA or the UCCJA to enforce a custody determination made by another state following a failed adoption where the other state did not, before making its custody determination, consider the best interests of the child. The other case is Lemley v Barr, 176 W Va 378; 343 SE2d 101 (1986). The West Virginia Supreme *700 Court, cognizant of the UCCJA,[18] concluded that there must be a best interests hearing before it could decide whether to require prospective adoptive parents to transfer custody of the child to biological parents whose parental rights had not been duly terminated. As in EEB and the instant case, the courts of the state where the biological parents resided had failed to conduct such a hearing before requiring the prospective adoptive parents to return the child to them.
Because the United States Supreme Court has ruled that the PKPA does not provide an implied cause of action in United States courts to determine which of two conflicting state custody determinations is valid,[19] there are no federal court decisions construing the PKPA and there will be none. The conflict between the New Jersey and the West Virginia decisions on the one hand, and this Court's decision in the instant case on the other, can only be resolved by the United States Supreme Court.
I agree with the New Jersey and West Virginia Supreme Courts  the only courts before the instant case to consider the precise issue before us  that the PKPA does not require a state, such as Michigan, to transfer, without a best interests hearing, custody of the child from prospective adoptive parents with whom she has bonded almost since birth, to comply with the decree of a state in which the biological parents live, when that decree was entered without considering *701 whether a transfer of custody would serve the child's best interests.[20]
E
Professor Clark, after reviewing at length the history of adjudication under the PKPA[21] and the UCCJA, found little or no consistency in adjudication. He saw little diminution in what he characterized as local court chauvinism, the awarding of custody to the home town parent.
He also observed that the PKPA and the UCCJA have provided an excuse for courts that wished to avoid the difficult and distasteful task of reaching the merits, the evaluation of parents as candidates for custody, "of trying to discover what disposition will best serve or least harm the child." Instead of grappling with the tough issues of deciding the case on the merits, "the case can be analyzed in terms technical enough to delight a medieval property lawyer. And if the judge is sufficiently determined, *702 he can often find that the case should be heard in some other state."[22]
I
The majority states that enforcement of the Iowa decree is required by the PKPA, and that it is unnecessary to consider the UCCJA because the PKPA preempts inconsistent state law.[23]
The majority identifies Iowa as the "home state" of the child under the PKPA. The majority errs in so concluding. Michigan is the home state under the PKPA, and therefore the Iowa decree is not enforceable under the PKPA in Michigan.
A
Congress enacted the PKPA, not because of an abstract concern about "interstate controversies over child custody," but rather "in the interest of greater stability of home environment and of secure family relationships for the child" (emphasis added)[24]  to secure "family relationships," not *703 solely biological family relationships. Among the evils that Congress found and sought to remedy was "harm to the welfare of children and their parents and other custodians." (Emphasis added.)[25]
Congress sought to achieve its objective of "secure family relationships for the child"[26] by assuring that a "determination of custody and visitation is rendered in the state which can best decide the case in the interest of the child." (Emphasis added.)[27] Michigan, not Iowa, is the state that can best decide this case in the interest of the child.
B
Congress identified the "home state" of the child as the "state which can best decide the case in the interest of the child."[28] "Home state" is defined as *704 the "State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as a parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons." (Emphasis added.)[29]
In this case, the child did not "live from birth" with either Cara Clausen or the DeBoers. The child resided for a few days at the hospital where she was born, then for two weeks with caregivers to whom the child had been entrusted, and has lived in Michigan since the end of February 1991, when, within three weeks of birth, physical custody was transferred to the DeBoers pursuant to a court order then entered in Iowa.
Michigan is the child's home state because she has lived in Michigan with the DeBoers, persons "acting as a parent,"[30] for at least six consecutive *705 months  actually for over two years.[31]
Michigan, the home state, would also qualify as the state having jurisdiction under the PKPA pursuant to the alternative "significant connection" test for a case where no state is the home state. In such a case, Congress designated as the "state which can best decide the case in the interest of the child," a state where "it is in the best interest of the child that a court of such state assume jurisdiction because" the "child and his parents, or the child and at least one contestant, have a significant connection" "other than mere physical presence in such State" and where there is available "substantial evidence concerning the child's present or future care, protection, training, and personal relationships."[32]
*706 The child did not have a significant connection with Daniel Schmidt in Iowa. There is more substantial evidence concerning the child's present or future care, protection, training and personal relationships in Michigan than in Iowa. There has not been a finding that it is in the child's best interests that Iowa assume jurisdiction of the custody dispute that arose  after an Iowa court entered an order transferring custody of the child to the DeBoers and they had set up home with the child in Michigan  when it became known that Cara Clausen had committed a fraud on the court and Daniel Schmidt came forward to assert his rights as a putative father.
C
The majority acknowledges that the PKPA "gives the home state exclusive continuing jurisdiction,"[33] and that "`[a] child custody determination ... is consistent with the provisions [of the PKPA] only if' the court making the determination had jurisdiction under its own laws, and the state was the `home state' of the child when the proceedings were commenced."[34] The majority then asserts that Iowa was "unquestionably the home state of the *707 child"[35] without any reference to or consideration of the statutory definitions[36] of "home state."
Iowa "unquestionably" was not the home state of the child, either at the time of the commencement of the adoption, or of the termination of parental rights proceedings,[37] or at any other time. Only a state in which the child has resided for at least six consecutive months can be a home state.[38] The child in the instant case resided in Iowa for less than three weeks.
The majority misstates the facts and misreads the PKPA, on which it so heavily relies, when it asserts that Iowa was "unquestionably the home state of the child."
The majority also asserts that "[t]here can be no doubt that at the time the Iowa proceedings commenced in February 1991, that state was the appropriate one to take jurisdiction; it was in the best position to resolve the issues presented."[39] (Emphasis added.)
The formulations "appropriate" and "best position" do not appear in the PKPA. It is an overstatement to assert that there can be "no doubt" that Iowa had jurisdiction, that it was the "appropriate *708 one" under the PKPA, when it was neither the "home state" nor the state of "significant connection" within the meaning of the PKPA. While Iowa may have been in the "best position" to resolve the issues concerning Daniel Schmidt's assertion of parental rights, it is not undoubted that Iowa was in the "best position" to resolve the custody issues here presented.
D
That Michigan, not Iowa, is the state that had jurisdiction within the meaning of the PKPA is clear from the commentary to the UCCJA on which the PKPA is modeled:
The first clause of the paragraph is important: Jurisdiction exists only if it is in the child's interest [emphasis in original], not merely the interest or convenience of the feuding parties [emphasis added], to determine custody in a particular state. The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum contact with the state. The submission of the parties to a forum [emphasis added], perhaps for purposes of divorce, is not sufficient [emphasis added] without additional factors establishing closer ties with the state. Divorce jurisdiction does not necessarily include custody jurisdiction. See Clark, Domestic Relations 578 (1968). [Comment to § 3, UCCJA, 9 ULA, part I, p 145.]
The issue to whom custody of the child should be awarded did not arise until after the child had left Iowa and had begun to reside in Michigan. That issue  the central issue in this case  did not fully ripen for adjudication until it was determined, following a hearing in November 1991, and a decision affirmed by the Iowa Supreme Court in September 1992, after the child had been living in *709 Michigan for over six months, that Daniel Schmidt was the biological father of the child, that he had not abandoned the child, and that he was not unfit under Iowa's standards.
As stated in the commentary, jurisdiction exists "only if it is in the child's interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state" (emphasis added).[40] "The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum contact with the state." (Emphasis added.)[41]
Neither the Iowa Supreme Court nor this Court has found that it is "in the child's interest" that Iowa assume jurisdiction to decide the custody dispute between the Schmidts and the DeBoers, which arose after the child began living in Michigan with the DeBoers.
There was no contact between Daniel Schmidt and the child in Iowa, minimum contact between Cara Schmidt and the child in Iowa, and maximum contact between the child and the DeBoers in Michigan.
The "submission of the parties" to Iowa jurisdiction for purposes of determining whether the Iowa court would enter an order of adoption, and later whether Daniel Schmidt was the biological father, had abandoned the child, or was a fit parent, was "not sufficient without additional factors establishing closer ties with the state. Divorce jurisdiction [and I would add parental rights termination jurisdiction[42]] does not necessarily include custody jurisdiction."[43]
*710 The bases for PKPA jurisdiction are "required" to "be interpreted in the spirit of the legislative purposes expressed in" the PKPA and the UCCJA,[44] among which are to achieve the entry of a custody decree "rendered in that state which can best decide the case in the interest of the child," and to "assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available."[45]
E
In sum, the underlying theme of the PKPA and the UCCJA is that a determination of custody and visitation should be made according to the child's best interests. Jurisdiction should be exercised by the state that has the most "significant connection" to the child if "it is in the best interest of the child."[46] Congress has said that that state is the home state, in this case Michigan.
The PKPA seeks to assure that a custody determination is "rendered in the State which can best decide the case in the interest of the child."[47] Congress has said that that state is the home state, in this case Michigan.
The PKPA was enacted to avoid jurisdictional competition between states that had, in the past, *711 resulted in shifting children from state to state "with harmful effects on their well-being."[48]
In according jurisdictional priority to the home state, or the state with significant connections, in this case Michigan, Congress sought to avoid jurisdictional competition, shifting children from state to state, and the resulting harmful effects on their well-being.
F
Assuming that the PKPA applies to adoption proceedings,[49] and that is the assumption on which the majority opinion is predicated,[50] the underlying themes of the act must be observed.
Professor Clark wrote that subject matter jurisdiction in adoption should be given to the home state of the child:
If the rationale of jurisdictional rules has been correctly outlined, it points to subject matter jurisdiction in adoption where a) the prospective adoptive parents, the petitioners, reside in the jurisdiction, and b) the child is physically present in the jurisdiction. "Reside" should be construed here to mean not technical domicile, but residence in the popular sense, of a person's home for the time *712 being, the purpose of this construction being merely to require a sufficient connection with the jurisdiction to enable the court to make the necessary judgments about the child's prospective environment.[[51]] [Emphasis added.]
He continues, stating that the analysis he suggests seems to be in the process of being adopted through the UCCJA and the PKPA:
If the foregoing argument is sound and the UCCJA and PKPA do apply to adoption and termination of parental rights, then the usual basis for jurisdiction over such proceedings will be proof that the child's "home state" is the state of the forum. Under the UCCJA jurisdiction may also be based on proof that the state of the forum has a "significant connection" with the child and at least one of the contesting parties. The use of either of these bases for jurisdiction should go far to achieve the purposes outlined above as being the purposes which jurisdictional rules governing adoption should serve.[[52]] [Emphasis added.]
As Professor Clark explains, the only issues in an adoption proceeding with respect to the natural parents, are "whether the consent is genuine, or whether the alleged abandonment or neglect did occur. These resemble the issues in the ordinary transitory lawsuit, and there is thus no need for any requirements of domicile or residence on the part of the natural parents."[53]
But, suggests Professor Clark, "[s]ince adoption consists of matching a child with a new parent or set of parents," there is a need for a "thorough opportunity to study the child and his background. To give the court this opportunity, the child must *713 be present and available in the jurisdiction."[54] He concludes for those reasons that that subject matter jurisdiction in adoption should be where the adoptive parents reside and the child is physically present.
Iowa might have been the appropriate jurisdiction and in the best position to decide whether Cara Clausen's consent was genuine and whether Daniel Schmidt's claimed parental rights should be terminated because he abandoned the child or was unfit. Merely because Iowa might have been the appropriate jurisdiction for those purposes, does not mean that it had jurisdiction within the meaning of the PKPA to decide whether custody of the child should be permanently awarded, in the case of this failed adoption, to the Schmidts or the DeBoers.
If, as Professor Clark contends, the PKPA provides "the governing rules for jurisdiction in [adoption] cases and for the effect to be given to decrees of adoption or for the termination of parental rights,"[55] then Michigan, the home state, and not Iowa had subject matter jurisdiction within the meaning of the PKPA.
G
I conclude that because Iowa was not the home state, or the state with significant connection, and thus did not have jurisdiction within the meaning of the PKPA, the PKPA does not require Michigan to enforce an Iowa decree transferring custody of the child from the DeBoers to the Schmidts.
II
It was necessary to resolve whether Daniel *714 Schmidt was the biological father, had abandoned the child, and was fit or unfit before Iowa could decide that he had parental rights and that his parental rights should not be terminated.
Until those issues were adjudicated, the issue whether custody should remain with the DeBoers because that was in the child's best interests had not ripened for adjudication.
The Iowa decree is not res judicata.
A
Although Iowa had in personam jurisdiction over all the parties, and, under traditional views of in personam jurisdiction, could enter a custody order transferring the child from the DeBoers to the Schmidts, it did not have subject matter jurisdiction to make a custody determination within the meaning of the PKPA, enforceable under the strictures of the PKPA, because Michigan, by then, had become the home state of the child and the state with significant connection. The DeBoers left Iowa with the child in good faith, not to escape Iowa jurisdiction.
The issues actually litigated and determined in Iowa were whether Daniel Schmidt was the biological father, had abandoned the child, and was fit or unfit. Because it was determined that he was the biological father, had not abandoned the child, and was not unfit, it was decreed that he had parental rights and that the DeBoers' petition for adoption must therefore be dismissed. Subsequently, it was determined that Cara Schmidt's parental rights would be restored because she and Daniel Schmidt had married, not because it was determined that her consent to the adoption of the child was invalid.
The proceedings in Iowa, which began as adoption *715 proceedings, were transformed into parental rights termination proceedings after Daniel Schmidt intervened in the adoption proceedings. In holding that his parental rights would be recognized and not terminated, the Iowa Supreme Court said that, in a parental rights termination proceeding, the best interests of the child are not to be considered under Iowa law in deciding whether parental rights should be terminated unless the statutory grounds for termination have been established. Having concluded that Daniel Schmidt's parental rights would not be terminated, the custody of the child was ordered transferred to him.
The DeBoers' petition for rehearing, asserting that although it had been adjudicated that Daniel Schmidt's parental rights would not be terminated, the best interests of the child should be considered before ordering the transfer of custody from the DeBoers to the Schmidts was denied without comment.
B
The only issues actually litigated and decided[56] were whether Daniel Schmidt's parental rights should be recognized and not terminated. The reason given by the Iowa Supreme Court for not considering the best interests of the child was that the child's best interests are not relevant on the issues in a parental rights termination proceeding.
The separate question whether, in a dispute between a parent and a third-party custodian, the *716 best interests of the child should be considered in deciding whether to transfer custody from the custodian to the parent was not actually litigated. And, as stated by the Iowa Supreme Court, a determination of the best interests of the child was not essential or even pertinent to decision of the question whether Daniel Schmidt's parental rights should be recognized and not terminated.
In denying rehearing, the Iowa Supreme Court did not enlarge on the reasons set forth in its opinion. Its silence does not provide a basis for concluding, contrary to the statements in the opinion explaining why the best interests of the child could not be considered on the termination of parental rights issue, that it had considered, adjudicated and decided that the best interests of the child may not be considered in deciding the separate issue whether custody should be transferred from the custodian, the DeBoers, to the parent, Daniel Schmidt. That issue, not having been adjudicated and decided, and not being necessary or pertinent to decision under Iowa law on the question whether Daniel Schmidt's parental rights should be terminated, is not precluded under the doctrine of res judicata.[57]
III
For reasons already stated, I would hold that the Iowa decree may not be enforced under the PKPA *717 because Iowa was not the home state, and thus did not have jurisdiction.
A
Assuming that Iowa had jurisdiction, the question remains whether the Iowa decree was subject to modification in Michigan, because Iowa declined to exercise jurisdiction to conduct a hearing to consider whether to modify on the basis of the best interests of the child following its conclusions that Daniel Schmidt was the biological father, had not abandoned the child, and was not unfit, and that his parental rights would be recognized. I would hold that the decree was subject to modification because Iowa declined to exercise jurisdiction to conduct such a hearing.[58]
The majority stresses[59] that, under the PKPA, the jurisdiction of Iowa courts "continues" as long as those courts have jurisdictions under the law of Iowa, and any contestant resides in Iowa,[60] and that a court of another state "shall not exercise jurisdiction in any proceeding for a custody determination *718 commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination."[61] (Emphasis added.)
I acknowledge, assuming that Iowa had jurisdiction, although it was not the home state or the state of significant connection, that its jurisdiction "continued." I further acknowledge that Michigan could not then exercise jurisdiction while Iowa courts were exercising jurisdiction "to make a custody determination." But the Iowa courts had made their custody determination, ordering that custody of the child be transferred, before Michigan exercised jurisdiction to consider whether the Iowa decree should be modified. The continuing jurisdiction provision of the PKPA does not bar Michigan from considering whether to modify the Iowa decree after Iowa had made its determination.
Proceeding on the hypothesis that Iowa had jurisdiction, although not the home state or state of significant connection, Michigan could exercise jurisdiction to modify the Iowa decree only if Iowa courts had "declined to exercise such jurisdiction to modify such determination."[62] The Iowa Supreme Court failed to exercise jurisdiction to modify when it denied rehearing to consider the best interests of the child, and, therefore, Michigan could properly exercise jurisdiction to modify the Iowa decree.
The New Jersey Supreme Court, in similar circumstances, held that "Ohio's failure to conduct a best interest hearing constitutes refusal to exercise jurisdiction under 28 USCA § 1738A(f)(2). Under *719 PKPA, therefore, New Jersey is free to modify the Ohio decree. This result comports with the congressional intent that child custody decisions be made in the state best able to determine the best interest of the child." EEB v DA, supra, 607.[63] The court said:
A custody dispute is more than a jurisdictional chess game in which winning depends on compliance with predetermined rules of play. A child is not a pawn. In exercising its discretion within the confines of UCCJA and PKPA, a court should consider not only the literal wording of the statutes *720 but their purpose: to define and stabilize the right to custody in the best interest of the child. [EEB v DA, supra, p 611.]
The West Virginia Supreme Court reached essentially the same conclusion in the construction of the UCCJA, and required a best interests hearing before it would decide, following a failed adoption, whether to enforce a decree ordering transfer of custody entered by the state where the biological parents resided where a best interests hearing had not been conducted. Lemley v Barr, supra.[64]
B
As in EEB, the DeBoers litigated the termination of parental rights issue in the Iowa courts. The DeBoers requested a best interests determination at each stage in the proceedings. After the Iowa Supreme Court ruled that the best interests of the child were not a factor to be considered in deciding whether to terminate the parental rights of Daniel Schmidt, the DeBoers, like the adoptive parents in EEB, petitioned for rehearing, seeking a best interests hearing with respect to a change in custody. The Iowa Supreme Court, like the Ohio *721 Supreme Court in EEB, denied rehearing.[65] The DeBoers then, like the adoptive parents in EEB and Lemley,[66] asked that the home state, Michigan, conduct a best interests hearing.
As in EEB, the refusal of the Iowa Supreme Court to hear the petition for rehearing constituted a refusal to exercise jurisdiction to modify. Because the Iowa Supreme Court declined to exercise jurisdiction to conduct a hearing to consider whether to modify on the basis of the best interests of the child, Michigan may, consistent with the PKPA, exercise jurisdiction to conduct a hearing to consider whether to modify on the basis of the best interests of the child.
C
In Interest of Brandon L E, the Supreme Court of West Virginia modified a Florida custody decree that required that a custodial grandmother transfer custody of a child to his father with whom he had little contact.[67] The court wrote: "To protect the equitable rights of a child in this situation, the *722 child's environment should not be disturbed without a clear showing of significant benefit to him, notwithstanding the parent's assertion of a legal right to the child."[68]
Daniel Schmidt, like the father in Brandon L E, prevailed on the issue of parental fitness. He asserted, as does Daniel Schmidt, that it was through no fault of his that he did not have an opportunity to establish a relationship with his child. The West Virginia Supreme Court, nevertheless, concluded that the child's best interests must prevail. The child's right to a best interests determination lies in equity and is not dissipated by a finding of parental fitness.[69]
Even in child snatching cases, courts have placed consideration of the child's best interests ahead of punishment of the wrongdoer. Courts have recognized that the passage of time may mean that it is in the child's best interests to continue living with the party that "kidnapped" the child from the lawful custodian.[70]
*723 D
The majority states that the suggestion that "the best interests purpose of the PKPA mandates a best interests analysis in Iowa" also suggests that "Congress intended to impose the substantive best interests rule in all custody determinations on the laws of the fifty states."[71]
I acknowledge that the "PKPA is a procedural and jurisdictional statute, which does not impose principles of substantive law on the states."[72]
Iowa may indeed be free to award the custody of children, in particular circumstances, without regard to their best interests. It does not follow that a decree rendered without consideration of the child's best interests is entitled to enforcement under the PKPA, where the court rendering the decree declined to exercise jurisdiction to conduct *724 a hearing to consider whether to modify the decree on the basis of the child's best interests.
A decree rendered by a state other than the home state is not a determination made "consistent with the provisions" of the PKPA.[73] A decree rendered without consideration of the child's best interests is not a decree that the Congress intended that all other states must enforce.
IV
The DeBoers advance several theories to support their argument that they have standing to litigate their claims to custody of the child. They argue that the UCCJA[74] grants them standing, that they have a protected liberty interest in their relationship with the child, and that Bowie v Arder.[75] does not deny them standing. The majority discusses and rejects all these arguments.[76]
I would hold that the DeBoers have standing under the PKPA. Because the DeBoers have standing under the PKPA, and, as the majority notes, the PKPA "clearly preempts inconsistent state law"[77] the majority's analysis and rejection of the DeBoers' arguments is incorrect.
A
The controlling provisions in the standing dispute are those defining jurisdiction. The DeBoers claim jurisdiction under both the "home state" *725 and "significant connection" tests of the PKPA.[78] "Home state" jurisdiction requires that the child be living with "his parents, a parent, or a person acting as parent" for at least six months "immediately preceding the time involved."[79] The PKPA provides that "`person acting as a parent' means a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody."[80] (Emphasis added.)
"[S]ignificant connection" jurisdiction hinges on whether "the child and his parents, or the child and at least one contestant, have a significant connection with the State other than mere physical presence."[81] (Emphasis added.) The PKPA provides that "`[c]ontestant' means a person, including a parent, who claims a right to custody or visitation of a child."[82]
The question, then, is whether the DeBoers are either "person[s] acting as ... parent[s]" or "contestants" within the meaning of the act. I would hold that the DeBoers are "person[s] acting as ... parent[s]" because they have physical custody of the child and were granted custody by a court, and also because they claim a right to custody.
It is undisputed that the DeBoers have physical custody of the child. Physical custody alone is not, however, enough under the definition of "person acting as a parent." A person must have physical custody and have been "awarded" custody by a court or claim a right to custody. Alternatively, *726 because they "claim a right to custody" they are "contestants" within the meaning of the PKPA.
The DeBoers obtained custody when Cara Schmidt signed the consent to adoption. They were granted and permitted to retain physical custody by court order during each step of the proceedings in Iowa, until the order of the Iowa district court terminating all rights to custody on December 3, 1992. Michigan courts have maintained the status quo thereafter.
The majority holds that the rescission of the temporary custody order by the Iowa district court made the DeBoers third parties to the child and stripped them of any basis on which to claim a substantive right of custody.[83]
The PKPA provides however, that a person acting as a parent is someone who "has ... been" awarded custody. "Has" refers to the past. In the past, the DeBoers were granted physical custody by the Iowa courts.
The DeBoers also have standing as persons who "claim[] a right to custody" of the child. The DeBoers' claim to a right of custody rests on the court orders granting them custody. The action of the Iowa courts granting the DeBoers physical custody of the child and maintaining physical custody with them throughout the proceedings in Iowa is evidence that the Iowa courts saw merit in the DeBoers' claim to custody. Although the Iowa courts have now ruled against the DeBoers, that does not strip the DeBoers of their claim to custody when their claim challenges the enforceability in Michigan of the Iowa decree.
The majority relies on Bowie to conclude that the DeBoers have no claim to custody. Bowie, however, does not address the definition of claim to custody. Bowie construes Michigan's Child Custody *727 Act.[84]Bowie and the Child Custody Act are preempted by the PKPA.
B
The majority concludes that the PKPA preempts inconsistent state law and that it controls the issue of jurisdiction in this case.[85] Since the PKPA preempts inconsistent state law when jurisdiction is the issue, then it preempts inconsistent state law on standing issues. This Court's decision in Bowie denying standing to third parties is necessarily limited to intrastate custody disputes and does not govern whether the DeBoers have standing in the instant case.
To conclude that the PKPA preempts in determining jurisdiction but not with respect to standing is untenable. The PKPA definitions of standing are part and parcel of the jurisdictional definitions. Standing in a "home state" depends on the presence in the state of a "person acting as a parent." Standing in a "significant connection" state depends on the presence in the state of a "contestant."
The PKPA is structured so that a determination of jurisdiction incorporates a finding of standing. The PKPA cannot be parsed to conclude that it preempts state law on jurisdiction but not on standing.
Superimposing this Court's decision in Bowie depriving third parties of standing in intrastate disputes upon third parties in interstate disputes governed by the PKPA violates the Supremacy Clause. The statement in Bowie that this Court was not limiting the decision to third-party actions brought under the Child Custody Act must necessarily *728 be limited to intrastate disputes in light of PKPA preemption.[86]
Because the PKPA governs this dispute and provides the DeBoers with standing, either as persons acting as parents or as contestants, there is no need to address any of the other standing arguments raised by the parties.
V
The majority states:
We express no opinion about whether we would require a Michigan court to hold a best interests of the child hearing if we were faced with the circumstances presented to the Iowa courts.[[87]]
This litigation unavoidably requires this Court to consider and decide whether a Michigan court would hold a best interests hearing were it faced with the circumstances presented to the Iowa courts. I think it clear that Michigan law would require such a hearing.
Also implicated are the child's and the DeBoers' constitutional right to equal protection of the laws and due process of law. To grant to some citizens of this state such a hearing, and to refuse to provide such a hearing to other citizens similarly situated, poses constitutional issues that can be avoided by recognizing that a best interests hearing is required in this case.
Consideration of the child's best interests is required in all manner of custody disputes, including adoptions, parental rights termination proceedings, *729 and proceedings concerning parental rights of putative fathers.[88]
The public policy of Michigan, as declared by the Legislature in § 39[89] of the Michigan Adoption Code,[90] requires a Michigan court to consider whether the best interests of a child would be served by awarding custody to a putative father, such as Daniel Schmidt, who did not live with the mother or contribute to her support during the pregnancy:[91]

*730 (1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served granting custody to him. If the court finds that it would not be in the best interest of the child to grant custody to the putative father, the court shall terminate his rights to the child.

(2) If the putative father has established a custodial relationship with the child or has provided *731 support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA. [MCL 710.39; MSA 27.3178(555.39). Emphasis added.]
Daniel Schmidt does not qualify under subsection 2 of the statute because he did not "establish a custodial relationship with the child" or provide "support or care for the mother during pregnancy" as required under subsection 2. Accordingly, Daniel Schmidt falls into the category of putative fathers for whom Michigan requires a best interests hearing before his parental rights would be recognized and he could obtain custody.[92]
VI
The sympathetic portrayal of the Schmidts in the majority opinion ignores that it was Cara Schmidt's fraud on the Iowa court and on Daniel Schmidt that is at the root of this controversy. If she had identified Daniel Schmidt as the father when she consented to waive her parental rights, before she had a change of heart, he too might have relinquished his parental rights. If Daniel Schmidt had refused to relinquish his rights, the DeBoers would not have assumed custody of the child and this litigation would have been avoided.
To fault the DeBoers is unwarranted. Why should they have believed that Cara Schmidt was telling the truth when she said she had fraudulently named the other man as the father? The DeBoers discovered that Schmidt had a dismal *732 record as a father.[93] They chose, as provided by the legal system, to challenge his claim that he was the biological father and also to contest his fitness as a father.
The Iowa courts thought there was sufficient merit in the DeBoers' claims that they maintained custody of the child with the DeBoers until after the Iowa Supreme Court ruled. One justice agreed with the DeBoers.[94] Justice Snell observed in dissent *733 that holding the rights of biological parents paramount to other values casts a cloud over adoptions.
The majority suggests that the DeBoers are posturing when they claim that they seek to vindicate the best interests of the child, and would be emotional not to accept unquestioning without seeking relief in another forum, the decision of this Court.[95]
The majority is not troubled that the result of its decision will be to return the child to Cara Schmidt despite her fraud. The majority appears to excuse her fraud by stressing that she gave her consent within forty hours, not seventy-two hours.[96] This was brought to the attention of the Iowa courts. The Iowa Supreme Court declined to hold that a consent given within seventy-two hours is necessarily invalid and remanded for a determination whether she waived the seventy-two hour provision.[97]
The decisions of this Court are entitled to respect. I am hopeful, however much I disagree with this decision, that it will be duly respected. But the Court goes too far in asking of the DeBoers unquestioning obedience to its decision. The Court's preachment bespeaks a grandiose view of its authority.
VII
The majority, by ignoring the best interests of *734 the child, has approached this case as if it were a contest between two parties over a piece of property. If the majority were true even to this approach, it would find for the DeBoers and not the Schmidts.
The relevant property law analysis would involve the allocation of risk of loss among innocent persons in cases of fraud. Here, the DeBoers and Daniel Schmidt are the victims of Cara Schmidt's fraud on the Iowa court. The question before a court would then be who must suffer the consequences of the fraud.
The law generally places the risk of loss on the person in the best position to avoid the loss in the first place.[98] Putative fathers are aware that sexual *735 intercourse may result in pregnancy, and of the potential opportunity to establish a family. If they wish to protect that opportunity, they can do so by maintaining some relationship with the women with whom they had intercourse to determine whether they become pregnant.
Daniel Schmidt and Cara Clausen ceased their sexual relationship within a month of the time the child was conceived. Daniel Schmidt had observed that Cara Clausen was pregnant. He was thus on notice and inquiry. The child was conceived in the last days of April, 1990 and was born on February 8, 1991. If Daniel Schmidt had bothered to count, he would have known that the child was probably his. Cara Schmidt's subterfuge was successful because, as Judge Snell observed, Daniel, knowing that Cara was pregnant, "did nothing to protect his rights." Where there is fraud, the law must place the risk of loss somewhere. I would not place that risk on the child but rather on the putative father.
VIII
The majority's decision appears to be driven by the same philosophical preference for the rights of biological parents reflected in this Court's decisions in Ruppel v Lesner, 421 Mich 559; 364 NW2d 665 (1984),[99] and Bowie v Arder, 441 Mich 23; 490 NW2d 568 (1992).[100]
*736 Those decisions and the instant litigation have inspired legislative efforts to amend the Child Custody Act to reverse the rule enunciated in Bowie effective as of the date it was decided, and to restore the standing of persons such as the DeBoers.[101]
The majority directs that this Court's judgment order enter forthwith. This has only been done, in the last twenty-five years, when, on recommendation of the Judicial Tenure Commission, a judge is removed from office,[102] or when, on two occasions, such a directive was necessary because otherwise scheduled bond sales would fall through. See Bigger v Pontiac, 390 Mich 1; 210 NW2d 1 (1973), concerning the sale of bonds for the construction of the Silverdome, and Eby v Lansing Bd of Water & Light, 417 Mich 297; 336 NW2d 205 (1983), concerning the sale of bonds for the construction of the Belle River power plant. Directing that the judgment order issue forthwith is clearly extraordinary.
The majority has not explained why such a direction is being given in this case. It might be to forestall the possible application to this case of any amendment of the Child Custody Act.
The majority's specific direction imposing time limits regarding the return of the child also reflects its apparent conclusion that the Schmidts are the aggrieved parties and the majority's determination to see to it that nothing prevents righting the wrong done them by the DeBoers in prolonging this litigation and by the Washtenaw Circuit Court in deciding to hold a best interests hearing.
I recognize that this litigation must come to an *737 end. But the judicial process has not run its course simply because this Court has announced its decision. The DeBoers may seek rehearing. They may seek a stay from this Court, which clearly will be refused; they may then seek a stay from a justice of the United States Supreme Court and apply for certiorari. They may even seek relief in Iowa. There may be other courses of legal action that resourceful counsel may recommend or undertake. It is unseemly for this Court to appear to be thwarting such efforts.
IX
Decisions of the United States Supreme Court[103] concerning the rights of putative fathers to retain custody of a child where a family relationship has been established have been relied on to construe Iowa statutes to provide Daniel Schmidt with the opportunity to create a family relationship. Viewing the matter as a contest between adults, the Schmidts and the DeBoers, the majority sees the Schmidts as having a better claim to the child than the DeBoers. The majority rules that the DeBoers have no standing in this Court, and cannot have a hearing on the merits whether their claim is better than the Schmidts.
There is a third party, the child. She, too, is a person with a liberty interest under the constitution. But, says the majority, that interest cannot be asserted by the DeBoers because they have no standing. It also rules that the child's next friend cannot assert her interest because there cannot be *738 any infringement of her independent liberty interest unless Daniel Schmidt is unfit.[104]
I would avoid reaching the question whether a child has a separate claim under the constitution until it is necessary to grapple with that momentous issue. That issue can be avoided by recognizing the child's statutory right under the Child Custody Act to have the court "declare the inherent rights"[105] of the child and by holding that the Iowa decree cannot be enforced in Michigan without a best interests hearing in the child's home state, Michigan.
Since the majority has decided that a best interests hearing is not required by the Child Custody Act or the PKPA, the Court should consider and decide whether the child's interests in protecting her family relationship with the DeBoers is as constitutionally protected as a liberty interest as Daniel Schmidt's asserted constitutionally protected liberty interest in having an opportunity to establish a family relationship with the child. The Court should also consider and decide how those interests can be reconciled, either by a hearing concerning the best interests of the child, or by another standard or other means.
If the danger confronting this child were physical injury, no one would question her right to invoke judicial process to protect herself against such injury. There is little difference, when viewed from the child's frame of reference, between a physical assault and a psychological assault.
The law provides compensation for mental distress in countless situations, and has recognized that persons who suffer psychological injury are *739 entitled to the protection of the law. It is only because this child cannot speak for herself that adults can avert their eyes from the pain that she will suffer.
NOTES
[1] Iowa Code Ann 600A.4(2)(d). There is no dispute that a lawyer representing the DeBoers went to her hospital room and obtained the mother's signature on the consent form forty hours after the child was born.
[2] Docket No. 96366 began as an action by the DeBoers seeking an order rejecting or modifying the orders of the Iowa courts that directed that Daniel Schmidt have custody of the child. The Court of Appeals reversed the Washtenaw Circuit Court's denial of Schmidt's motion for summary judgment. The court concluded that the circuit court lacked jurisdiction under the Uniform Child Custody Jurisdiction Act, and that the Iowa judgment awarding custody to the child's father must be enforced. The Court of Appeals also ruled that under our decision in Bowie v Arder, 441 Mich 23; 490 NW2d 568 (1992), the DeBoers lacked standing to bring the action. We granted the DeBoers' application for leave to appeal.
[3] MCL 600.651 et seq.; MSA 27A.651 et seq.
[4] 28 USC 1738A.
[5] Docket Nos. 96441, 96531, and 96532 involve an action brought by an attorney as next friend of the child against both the Schmidts and the DeBoers, asserting that the child has an independent right to a best interests hearing to determine custody. The Schmidts filed an application for leave to appeal to the Court of Appeals from the Washtenaw Circuit Court's appointment of the next friend and its issuance of a temporary injunction against transfer of custody. They also filed an application for leave to appeal to this Court before decision by the Court of Appeals. We granted leave to appeal and directed the parties to brief the issue whether the action should be dismissed for failure to state a claim upon which relief may be granted.
[6] She and Daniel Schmidt married in April 1992.
[7] See In re BGC, 496 NW2d 239 (Iowa, 1992)
[8] The Iowa district court's December 27, 1991, order had directed that the DeBoers return the child to the physical custody of Schmidt no later than January 12, 1992. That order was stayed during the Iowa appellate proceedings.
[9] After the Washtenaw Circuit Court's denial of the natural father's motion for summary judgment, proceedings have continued in Iowa. On January 27, 1993, the Iowa district court held the DeBoers in contempt of court, and issued bench warrants for their arrest. The Iowa juvenile court entered an order on February 17, 1993, restoring Cara (Clausen) Schmidt's parental rights.

A best interests of the child determination hearing began in Washtenaw Circuit Court on January 29, 1993, and continued for eight days. In a decision rendered from the bench on February 12, 1993, the Washtenaw Circuit Court found that it was in the best interests of the child for her to remain with the DeBoers. That decision is not at issue in the instant appeal.
[10] The Court of Appeals had initially denied Schmidt's application for leave to appeal for failure to persuade the Court of the need for immediate appellate review. We remanded the case to that Court for consideration as on leave granted.
[11] The order stated that the grant of leave to appeal was "limited to the issues of jurisdiction and standing."
[12] That order stated that the grant of leave to appeal was "limited to the question whether the complaint should be dismissed for failure to state a claim on which relief may be granted."

In addition, the order stayed proceedings in the Court of Appeals and the Washtenaw Circuit Court until further order of this Court.
[13] US Const, art IV, § 1.
[14] See, generally, Foster, Child custody jurisdiction: UCCJA and PKPA, 27 NYLS L R 297 (1981).
[15] MCL 600.653; MSA 27A.653 provides, in part:

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree or judgment if any of the following exist:
(a) This state is the home state of the child at the time of commencement of the proceeding or had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state.
(b) It is in the best interest of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least 1 contestant, have a significant connection with this state and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.
(c) The child is physically present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent.
(d) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivisions (a), (b), or (c) or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child and it is in the best interest of the child that this court assume jurisdiction.
Home state is defined in MCL 600.652(e); MSA 27A.652(e):
"Home State" means the state in which the child immediately preceding the time involved lived with his or her parents, a parent, or a person acting as parent, for at least 6 consecutive months, and in the case of a child less than 6 months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of the named persons are counted as part of the 6-month or other period.
[16] MCL 600.656(1); MSA 27A.656(1) provides that a court shall not exercise jurisdiction if a case is pending in another jurisdiction:

A court of this state shall not exercise its jurisdiction under sections 651 to 673 if at the time of filing the petition a proceeding concerning the custody of the child is pending in a court of another state exercising jurisdiction substantially in conformity with sections 651 to 673, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons or unless temporary action by a court of this state is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent.
[17] MCL 600.663; MSA 27A.663 requires the enforcement of custody decisions rendered in other states:

The courts of this state shall recognize and enforce an initial or modification decree or judgment of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with sections 651 to 673 or which was made under factual circumstances meeting the jurisdictional standards of sections 651 to 673 as long as this decree or judgment has not been modified in accordance with jurisdictional standards substantially similar to those of sections 651 to 673.
[18] MCL 600.664(1); MSA 27A.664(1) provides that a decree shall not be modified if the court which entered the decree still has jurisdiction under the act:

If a court of another state has made a custody decree or judgment, a court of this state shall not modify that decree or judgment unless it appears to the court of this state that the court which rendered the decree or judgment does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with sections 651 to 673 or has declined to assume jurisdiction to modify the decree or judgment and the court of this state has jurisdiction.
[19] See, generally, Baron, Federal preemption in the resolution of child custody jurisdiction disputes, 45 Ark L R 885 (1993).
[20] Although the title of the act refers to "parental kidnapping," and concerns about parents taking children out of a state in violation of a custody order were doubtless an important impetus for the enactment of the statute, it applies to any custody determination, which is defined as:

[A] judgment, decree, or other order of a court providing for the custody or visitation of a child, and includes permanent and temporary orders, and initial orders and modifications.... [28 USC 1738A(b)(3).]
[21] The statute provides, in part:

(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.
* * *
(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if 
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met:
(A) such State (i) is the home State of the child on the date of the commencement of the proceeding. .. .
* * *
(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.
(e) Before a child custody determination is made, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of a child.
(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if 
(1) it has jurisdiction to make such a child custody determination; and
(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.
(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of the other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.
[22] On the very day that they commenced this action in Washtenaw Circuit Court, the Iowa district court was holding a hearing at which it terminated the DeBoers' rights to act as temporary custodians or temporary guardians, appointed Daniel Schmidt as temporary guardian or custodian, and authorized him to proceed by any legal means, "to enforce this order directing that Jan and Roberta DeBoer relinquish immediate physical custody and possession of the child to him or his designee." Any construction of the UCCJA that would lead to the conclusion that this Iowa proceeding was no longer pending would destroy the act as a tool for avoiding jurisdictional disputes. Litigants having custody could relocate, wait until the jurisdictional requisites are met in the new state, and bring a modification action any time after the first state's order had become final.

Such a result would render courts powerless to enforce judgments entered in full compliance with procedural due process, and make the adjudicated rights of persons held to be adoptive parents, as well as those found to be fit biological parents, vulnerable to collateral attack by the disappointed contestant. Such a result is not in the best interests of families, biological or adoptive.
In addition, there is substantial doubt whether the Iowa decision is the kind of "custody order" that is modifiable at all. When we speak of modifying custody orders, we are ordinarily talking about the typical case of a contest between natural parents. Such orders are at least theoretically perpetually modifiable. Where circumstances change, modification can be made in the child's best interests, because the biological parents have an inherent right to care, custody, and control of the child. That rationale, however, does not apply in a case such as this involving an adoption petition. The decision not to terminate Daniel Schmidt's rights and to dismiss the adoption petition put an end to the proceeding, just as would have been the case had the Iowa courts terminated Schmidt's rights and finalized the adoption. To say that the order in the instant case is modifiable would have the effect of destabilizing finalized adoptions as well as other final orders.
[23] The Michigan Court of Appeals cases on which the DeBoers principally rely, In re Danke, 169 Mich App 453; 426 NW2d 740 (1988), and Bull v Bull, 109 Mich App 328; 311 NW2d 768 (1981), do not mention the PKPA. The order being appealed in Bull was entered before that act's effective date.

At oral argument, counsel for the DeBoers conceded the applicability of the act to the instant case. The PKPA clearly preempts inconsistent state law. Ex parte Lee, 445 So 2d 287, 290 (Ala Civ App, 1983); In re Marriage of Pedowitz, 179 Cal App 2d 992, 999; 225 Cal Rptr 186 (1986); Tufares v Wright, 98 NM 8, 10; 644 P2d 522 (1982); Voninski v Voninski, 661 SW2d 872, 876 (Tenn App, 1982); Arbogast v Arbogast, 327 SE2d 675, 679 (W Va, 1984).
[24] The PKPA is a procedural and jurisdictional statute, which does not impose principles of substantive law on the states. As the United States Supreme Court has said:

"The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." In re Burrus, 136 US 586, 593-594 [10 S Ct 850; 34 L Ed 500] (1890).... On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be preempted. [Hisquierdo v Hisquierdo, 439 US 572, 581; 99 S Ct 802; 59 L Ed 2d 1 (1979). See also Rose v Rose, 481 US 619, 625; 107 S Ct 2029; 95 L Ed 2d 599 (1987). The Court reviewed the legislative history of the PKPA in Thompson v Thompson, supra, and concluded that its purpose was to "remedy the inapplicability of full faith and credit requirements to custody determinations." 484 US 181.]
[25] 28 USC 1738A(c)(1).

Though they arise in varying factual circumstances, cases interpreting the PKPA have given an expansive interpretation of continuing exclusive jurisdiction in the original state. The undertaking of enforcement proceedings is certainly sufficient. Even a considerable period of inactivity does not establish that jurisdiction no longer exists. Indeed, it does not appear that any ongoing activity in the original state is required, as long as under that state's law the original court would have had jurisdiction over requests for enforcement, modification, etc.
For example, in State ex rel Valles v Brown, 97 NM 327; 639 P2d 1181 (1981), a divorce judgment, including a custody order, was entered in Washington. No further proceedings had taken place there, but New Mexico courts concluded that they lacked jurisdiction to modify a custody order.
In Murphy v Woerner, 748 P2d 749 (Alas, 1988), there was a 1981 Kansas divorce. The custodial parent moved to Alaska in 1982. The Kansas court ruled on several visitation and custody disputes. In 1985, a change of custody order was sought in Alaska to modify the Kansas decree. The Alaska Supreme Court held that there was no Alaska jurisdiction.
Barndt v Barndt, 397 Pa Super 321; 580 A2d 320 (1990), involved a 1983 divorce in North Dakota, with no further proceedings taking place there. An action was filed in Pennsylvania in 1987 to change custody. The Pennsylvania court found that under North Dakota law the original court would have had continuing jurisdiction to modify custody, and therefore Pennsylvania lacked jurisdiction.
In Michalik v Michalik, 164 Wis 2d 544; 476 NW2d 586 (1991), there was an Indiana divorce in 1987, with several contempt proceedings in 1989 regarding denial of visitation. The custodial parent moved to Wisconsin. The Wisconsin court held that Indiana still had exclusive jurisdiction.
[26] See, e.g., In re Marriage of Cervetti, 497 NW2d 897, 899 (Iowa, 1993); In re Leyda, 398 NW2d 815, 819 (Iowa, 1987).
[27] In re Custody of Ross, 291 Or 263, 279; 630 P2d 353 (1981).
[28] May v Anderson, 345 US 528, 539; 73 S Ct 840; 97 L Ed 1221 (1953) (Jackson, J., dissenting).
[29] The DeBoers are also critical of the Court of Appeals for focusing on the avoidance of jurisdictional competition between states as the principal purpose of the UCCJA. Rather, they see it as having two purposes, that noted by the Court of Appeals and also the purpose of insuring that the state with the maximum contacts with the child makes custody determinations because that is in the child's best interests. They point to several places in the act where the term "interest" of the child or the child's "best interests" are used. Sections 651(1)(b), 657(3), and 658(2).
[30] The DeBoers also include arguments to the effect that even under Iowa law, a best interests hearing was required, citing several cases, Halstead v Halstead, 259 Iowa 526; 144 NW2d 861 (1966); Painter v Bannister, 258 Iowa 1390; 140 NW2d 152 (1966), and statutes, Iowa Code Ann 600.1, 600.13(1)(c) (Adoption Code); 600A.1 (termination of parental rights); 600B.40 (Paternity Act). The Iowa courts relied on the constitutionally protected opportunity interest of a biological father in Schmidt's circumstance to conclude that termination was not in the best interest of the child unless unfitness was shown, and found, as fact, that the DeBoers had not shown unfitness. We have not had occasion to construe our adoption statute, MCL 710.39(1); MSA 27.3178(555.39)(1), in light of Lehr v Robertson, 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983). We cannot say, however, that if the constitution requires such construction, it would be against our public policy to do so.
[31] The DeBoers rely principally on two cases, Bull v Bull, n 23 supra, and the New Jersey decision in EEB v DA, 89 NJ 595; 446 A2d 871 (1982), cert den sub nom Angle v Bowen, 459 US 1210; 103 S Ct 1203; 75 L Ed 2d 445 (1983), which refused to enforce custody awards by courts in other states where the other state court did not conduct a hearing using a best interests of the child test. As noted earlier, the decision being appealed in Bull v Bull was made before the effective date of the PKPA. Further, the Bull Court found that the Georgia decision did not comport with the UCCJA. We find no such flaw in the Iowa decisions in the instant case. However, insofar as Bull v Bull is inconsistent with this opinion, it is overruled.

We reject the rationale of EEB v DA, to the extent that it is cited for the proposition that an order transferring custody pursuant to a judgment determining custody is modifiable per se on a best-interests analysis. The DeBoers have cited neither Michigan nor Iowa law for this proposition, which, if accepted, would mean that an order granting custody would be enforceable only if the losing party voluntarily complied. Such a construction would invite the losing party to resist transfer, in order to have the court issue an enforcement order, which would form the basis for an opportunity to relitigate best interests. Such a result would introduce a degree of instability into this jurisprudence antithetical to the best interests of all parties.
[32] This is the "stepparent adoption" section of the code, MCL 710.51(6); MSA 27.3178(555.51)(6), which permits the termination of a natural father's parental rights in certain circumstances.
[33] That chapter governs juveniles and the juvenile division of the probate court and permits termination of parental rights for abuse and neglect.
[34] We are not aware of any similar provision in the Iowa Adoption Code.
[35] MCL 722.21 et seq.; MSA 25.312(1) et seq.
[36] They also point to other states that have given third parties such standing. E.g., Buness v Gillen, 781 P2d 985 (Alas, 1989); In re Janette H, 191 Cal App 3d 1421; 242 Cal Rptr 567 (1987); Patzer v Glaser, 368 NW2d 561 (ND, 1985).
[37] Subsection (1)(a) says, in part:

This state is the home state of the child at the time of commencement of the proceeding or had been the child's home state within 6 months before commencement of the proceeding ... and a parent or person acting as parent continues to live in this state. [MCL 600.653(1)(a); MSA 27A.653(1)(a). Emphasis added.]
The UCCJA defines "[p]erson acting as parent" as "a person, other than a parent, who has physical custody of a child and ... claims a right to custody." MCL 600.652(i); MSA 27A.652(i). (Emphasis added.)
Subsection (1)(b) refers to a "contestant":
It is in the best interest of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least 1 contestant, have a significant connection with this state.... [MCL 600.653(1)(b); MSA 27A.653(1)(b). Emphasis added.]
"Contestant," as defined in the UCCJA, means, "a person, including a parent, who claims a right to custody or visitation rights with respect to a child." MCL 600.652(a); MSA 27A.652(a). (Emphasis added.)
[38] Thus, the argument regarding application of the Child Custody Act as incidental to otherwise existing jurisdiction never arises  the UCCJA does not create standing.
[39] MCL 722.26b(1); MSA 25.312(6b)(1).
[40] The situation would have been the same if, after having determined that Daniel Schmidt was the father of the child, the Iowa courts had terminated his parental rights. He would have had standing to litigate the custody issue while established as the natural father, but that right would have disappeared with the termination order. The rescission of the temporary custody order has the same effect on the rights of the DeBoers, whether that rescission took place before the filing of the instant Washtenaw Circuit Court action, or after the action had been instituted.
[41] Lehr v Robertson, supra; Quilloin v Walcott, supra.
[42] Michael H v Gerald D, supra.
[43] Michigan courts in similar circumstances have noted that prompt action by the father to assert parental rights, combined with the father's being prevented from developing a relationship with the child by actions of the courts or the custodians, are factors that excuse or mitigate the failure to establish such a relationship. See, e.g., In re Baby Boy Barlow, 404 Mich 216, 237-238; 273 NW2d 35 (1978); In re Robert P, 36 Mich App 497, 500; 194 NW2d 18 (1971).
[44] The next friend has pointed to no appellate decisions recognizing such an action by a minor. Indeed, it is clear that what is sought in this case is not so much recognition of a child's right to bring an action, but a procedure by which persons like the DeBoers, who lack standing to bring a Child Custody Act action, may circumvent those rules. It is obviously a fiction to speak of this two-year-old child as expressing a preference regarding custody. This is a case of adults deciding what they think is best for her and using the next-friend procedure. As counsel for the next friend said in oral argument, third-party custodians who lack standing will simply see that a next friend is appointed.
[45] MCL 722.1(b); MSA 25.244(1)(b), defines "parents" as follows:

"Parents" means natural parents, if married prior or subsequent to the minor's birth; adopting parents, if the minor has been legally adopted; or the mother, if the minor is illegitimate.
[46] In those circumstances, typically through the intervention of governmental agencies, a determination can be made regarding whether the parents' unfitness so breaks the mutual due process liberty interests as to justify interference with the parent-child relationship. In addition, mechanisms are provided for the child to seek such protection. See, e.g., MCL 712A.19b; MSA 27.3178(598.19b) (allowing a child who has been in foster care or in the custody of a guardian or limited guardian to petition for a termination of parental rights); MCL 700.426; MSA 27.5426 (allowing a minor age fourteen or older to nominate a person as the minor's guardian); MCL 722.4 to 722.4e; MSA 25.244(4) to 25.244(4e) (allowing a minor who is at least sixteen years old to petition the court for emancipation). These procedures, are, of course, in addition to the commonly used provisions for guardianships in the revised Probate Code, MCL 700.401 et seq.; MSA 27.5401 et seq., and the abuse and neglect procedures of the Juvenile Code. MCL 712A.1 et seq.; MSA 27.3178(598.1) et seq.
[47] Courts in other states have followed these principles in recent decisions. Sheppard v Sheppard, 230 Kan 146; 630 P2d 1121 (1981); Woodfin v Bentley, 596 So 2d 918 (Ala, 1992); In re SBL, 150 Vt 294; 553 A2d 1078 (1988); Stuhr v Stuhr, 240 Neb 239; 481 NW2d 212 (1992).
[48] Even if we were to conclude that the child has liberty interests that were not adequately represented in the previous Iowa proceedings, the PKPA would require that any new action on her behalf be brought in Iowa, which has continuing exclusive jurisdiction. Like the case filed by the DeBoers, the child's action seeks to modify the custody determination made by the Iowa courts. The fact that she is nominally a new party is of no significance. Analytically, the case is no different than a more typical custody dispute in which the court of one state has entered a custody order in a divorce case and the custodial parent moves with the child to another state. The original state would have exclusive continuing jurisdiction to modify the order. If the custodial parent remarries, that jurisdiction could not be avoided by having the stepparent file a new action (for example, to eliminate visitation by the noncustodial parent) in the second state. Thus, the Washtenaw Circuit Court lacked jurisdiction to hear the second case.
[49] Like the Iowa Supreme Court, we echo the sentiments of the Iowa district judge:

[T]he Court is under no illusion that this tragic case is other than an unbelievably traumatic event. .. . While cognizant of the heartache which this decision will ultimately cause, this Court is presented with no other option than that dictated by the law in this state. Purely equitable principles cannot be substituted for well established principles of law.
[1] Ante, p 655.
[2] Ante, pp 692-693.
[3] Lemley v Barr, 176 W Va 378, 381; 343 SE2d 101 (1986).
[4] The media reports that the Schmidts have said that they may or will call the child Jessica Schmidt.
[5] This Court granted leave to appeal limited to the issues of jurisdiction and standing (No. 96366), and failure to state a claim on which relief may be granted (Nos. 96441, 96531, 96532). The decision of the circuit judge that it was in the child's best interests that she remain with the DeBoers is not at issue in this appeal (see ante, p 660, n 9; p 661, ns 11-12) and remains subject to appellate review.
[6] See part F, pp 711-713, n 51 et seq.
[7] 2 Clark, Domestic Relations, 2d ed, § 20.1, p 479.
[8] Id., § 20.6, pp 530 ff.
[9] Id., p 529.
[10] Id., pp 532-533.

Professor Clark continues:
The most difficult cases are those in which a parent places his child temporarily in the custody of another person, perhaps with the understanding that the parent will resume custody when he is able to, or in which a parent places the child with prospective adoptive parents. The problems arise when the parent seeks to reclaim the child or to revoke his consent to adoption and the non-parent refuses to restore the child to the custody of the parent. In the temporary placement cases, if the child is not returned to the parent, the parent's expectations will be frustrated thereby deepening the parent's heartache and bitterness. And in the adoption cases the parent may have consented to the adoption under the stress of circumstances and may have tried to change her mind relatively soon after giving the consent. Due to these factors, the parent's interest should perhaps be given greater weight than in the stepparent cases, and the child retained in the custody of the non-parent only where his welfare clearly dictates that result. Even in these circumstances, however, it should not be necessary to prove the parent unfit as a condition of awarding custody to the non-parent. If the child has been in the non-parent's care for a substantial period of time, taking into account that time may have a different significance for a child, and if the child is strongly attached to the non-parent emotionally and psychologically, so that the child will suffer serious harm by being shifted to another's custody, then the non-parent should be awarded custody. It should not matter for this purpose that delays in the process of litigation account for much of the time during which the child remains with the non-parent, since the effect on the child is the same regardless of the source of the delay. It must be conceded that some of the cases would strongly disagree with an award of custody to the non-parent in these circumstances, absent proof of unfitness, thereby exhibiting a startling lack of concern for the interests of the children. [Id., pp 534-535.]
[11] The majority relies on Smith v Organization of Foster Families, 431 US 816, 843-844; 97 S Ct 2094; 53 L Ed 2d 14 (1977). In that case, the United States Supreme Court held that in a contest between foster parents and biological parents, that procedures enacted by New York respecting the removal of children from foster care were constitutional.

I see no need to decide whether the DeBoers, as prospective adoptive persons, have a constitutionally protected "liberty" interest in preservation of their family relationship with the child.
Rather, I would hold that Congress did not, in enacting the PKPA, designating the "home state" of the child as the state where a custody determination, enforceable under the PKPA, shall be made, intend to require the home state of the child, in this case Michigan, to enforce an Iowa decree made without consideration of, and other than on the basis of, the best interests of the child.
[12] The state laws, the Uniform Child Custody Jurisdiction Act, 9 ULA, part I, p 115 et seq.; MCL 600.651; MSA 27A.651, and the Child Custody Act, MCL 722.21 et seq.; MSA 25.312(1) et seq., were enacted to serve the same purpose.
[13] Ante, p 656, ns 3-4 and accompanying text; ante, pp 692-693, following n 49.
[14] And also the legislative history of the UCCJA on which the PKPA was modeled.
[15] Ante, p 675, n 31.
[16] Ante, p 675, n 31.
[17] Ante, p 675, n 31.
[18] Lemley did not consider the PKPA, but since the PKPA is modeled on the UCCJA, and the relevant language is identical, the analysis of the West Virginia Supreme Court is not to be faulted simply because it did not consider the PKPA separately from the UCCJA.
[19] Thompson v Thompson, 484 US 174, 187; 108 S Ct 513; 98 L Ed 2d 512 (1988). The Court said: "ultimate review remains available in this Court for truly intractable jurisdictional deadlocks."
[20] The majority states:

For the first time at oral argument, the DeBoers asserted that the order was not made consistently with the PKPA. As they contended regarding the UCCJA, they think an order is not made consistently with the statute if a best interests of the child test is not used. [Ante, p 676.]
In stating that the DeBoers made that assertion for the first time at oral argument, the majority fails to mention that while there was some passing mention of the PKPA in the briefs, neither the DeBoers nor the Schmidts relied in their briefs on the PKPA. They relied, rather, on the UCCJA. It was this Court that has moved the focus from the UCCJA to the PKPA during questioning in oral argument.
[21] Professor Clark states that some commentators still express concern regarding the constitutionality of the PKPA and the UCCJA in light of May v Anderson, 345 US 528; 73 S Ct 840; 97 L Ed 1121 (1953), but that the case law "now overwhelmingly assumes or proclaims the constitutionality of the UCCJA," and that he is of the opinion that there is "increased likelihood, but not yet assurance, that the UCCJA and the federal act may withstand constitutional attack." Id., pocket part, § 15.41, p 63, adding insert for p 524 of the original text.
[22] 1 Clark, Domestic Relations, § 13.5, p 825.
[23] Ante, p 668, n 23 and accompanying text.
[24] The "general purposes" of the PKPA are stated as follows:

(1) promote cooperation between State courts to the end that a determination of custody and visitation is rendered in the State which can best decide the case in the interest of the child;
(2) promote and expand the exchange of information and other forms of mutual assistance between States which are concerned with the same child;
(3) facilitate the enforcement of custody and visitation decrees of sister States;
(4) discourage continuing interstate controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;
(5) avoid jurisdictional competition and conflict between State courts in matters of child custody and visitation which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being; and
(6) deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards. [Parental Kidnapping Prevention Act of 1980; PL 96-611, § 7(c), 94 Stat 3568. Emphasis added.]
[25] Congress finds that 
* * *
(4) among the results of those conditions and activities are the failure of the courts of such jurisdictions to give full faith and credit to the judicial proceedings of the other jurisdictions, the deprivation of rights of liberty and property without due process of law, burdens on commerce among such jurisdictions and with foreign nations, and harm to the welfare of children and their parents and other custodians. [Id., § 7(a). Emphasis added.]
[26] PL 96-611, § 7(c)(4), 94 Stat 3568.
[27] Id., § 7(c)(1).
[28] Section (c) of the PKPA provides:

(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if 
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met
(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;
(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships.... [28 USC 1738A(c).]
[29] 28 USC 1738A(b)(4).
[30] The term "person acting as a parent" is defined in the PKPA as meaning: "a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody." "Physical custody" is there defined as meaning: "actual possession and control of a child." 28 USC 1738A(b)(6), (7).

The DeBoers have had "actual possession and control" of the child since February 1991; they were "awarded custody by a court" and also qualify as persons acting as parents because they "claim a right to custody." They are persons acting as parents within the meaning of the PKPA.
[31] The prefatory note to the UCCJA, on which the PKPA was based, states that it "limits custody jurisdiction to the state where the child has his home or where there are other strong contacts with the child and his family. See Section 3." 9 ULA 118. (Emphasis added.)

The commentary to § 3 states that the UCCJA establishes "two major bases for jurisdiction. In the first place, a court in the child's home state has jurisdiction, and secondly, if there is no home state or the child and his family have equal or stronger ties with another state, a court in that state has jurisdiction." 9 ULA 144.
The commentary continues that a "6-month period has been selected in order to have a definite and certain test which is at the same time based on a reasonable assumption of fact. [Citation omitted.] `Most American children are integrated into an American community after living there six months; consequently this period of residence would seem to provide a reasonable criterion for identifying the established home.'" Id. (Emphasis added.)
[32] 28 USC 1738A(c)(2)(B). See n 28 for text.

The child has not been "physically present" in Iowa since February 1991. The child and the DeBoers, who are contestants  defined by the PKPA to mean a "person, including a parent, who claims a right to custody or visitation of a child" (28 USC 1738A[b][2])  are physically present in Michigan and "have a significant connection" with Michigan "other than mere physical presence" in Michigan, and there is available in Michigan "substantial evidence concerning the child's present or future care, protection, training, and personal relationships."
The significant connection test shows why Congress selected as the state where the child has resided with a parent or a person acting as a parent for more than six months  the home state  as the state that has jurisdiction with priority before any other state. The home state would ordinarily meet all the criteria of a state qualifying under the alternative; the child and a parent, or the child and a contestant, would necessarily have a significant connection, other than mere physical presence, with the home state, and there would there be available substantial evidence concerning the child's present or future care, protection, training, and personal relationships.
In contrast with a state qualifying under the alternative, it is presumed that it is in the best interests of the child for the home state to assume jurisdiction. Under the alternative, that presumption appears to be rebuttable because, under the alternative, there must be a finding that it is in the best interests of the child that the court of that state assume jurisdiction.
[33] Ante, p 671.
[34] Ante, p 671 (emphasis added); 28 USC 1738A(c).
[35] the time of commencement of both the termination and adoption proceedings, Iowa unquestionably had jurisdiction under its own laws and Iowa was unquestionably the home state of the child. Thus, the child custody determination made by the Iowa court was made consistently with the provisions of the PKPA. [Ante, p 671. Emphasis added.]
[36] Ns 28-31 and accompanying text.
[37] The Iowa proceedings commenced as adoption proceedings, and were transformed into parental rights termination proceedings after Daniel Schmidt intervened in the adoption proceedings. See part II.
[38] The home state of a child less than six months old is the state in which the child "lived from birth" with a parent or a person acting as a parent. 28 USC 1738A(b)(4). The child in the instant case did not live from birth with either a parent or a person acting as a parent. See text following n 29.
[39] Ante, p 676.
[40] Comment to § 3, UCCJA, 9 ULA, part I, pp 144-145.
[41] Id.
[42] See n 37.
[43] 9 ULA, part I, p 145, quoted in text preceding n 40.
[44] Commentary, 9 ULA, part I, p 145.
[45] Uniform Child Custody Jurisdiction Act (1968 act), § 1(2), (3); commentary, 9 ULA, part I, pp 124, 143-144; MCL 600.651(1)(b), (c); MSA 27A.651(1)(b), (c). See ns 24 and 28 for PKPA text.
[46] 28 USC 1738A(c)(2)(B). See n 28 for text.
[47] See n 24 for text.
[48] 94 Stat 3569, § 7(c)(5).
[49] The PKPA and UCCJA were directed primarily to custody determinations that resolve disputes between parents, following divorce or separation. The well-established standard is the best interests of the child. See n 7.

Those acts are being relied on in custody disputes between parents and third parties, e.g., grandparents and prospective adoptive parents. The underlying criteria and theses of the PKPA must be given force and effect in these disputes, namely, that to be enforceable under the PKPA, a child custody determination must have been made in the child's home state or alternatively in the state where the child has significant connections.
[50] If the PKPA does not apply to adoption proceedings, then the majority errs in ruling that the PKPA requires enforcement of the Iowa decree.
[51] 2 Clark, Domestic Relations, 2d ed, § 21.3, p 596.
[52] Id., p 598.
[53] Id., p 595. (Emphasis added.)
[54] Id., § 21.3, p 596.
[55] Id.
[56] an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. [1 Restatement Judgments, 2d, § 27, p 250. Emphasis added.]
[57] If the Iowa Supreme Court had granted the DeBoers' petition seeking a rehearing and a determination of the child's best interests, and Iowa courts had decided that the best interests of the child required that custody of the child be transferred to the Schmidts, such a determination would have been res judicata, and the Iowa decree would have been a judgment to which Michigan must accord full faith and credit. See Wright, Federal Courts, 4th ed, § 16, pp 84 ff.

There was, however, no hearing in Iowa adjudicating the best interests of the child. That issue is not precluded under the doctrine of res judicata.
[58] The PKPA modification provision reads as follows:

A court of a State may modify a determination of custody of the same child made by a court of another State, if 
(1) it has jurisdiction to make such a child custody determination; and
(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination. [28 USC 1738A(f).]
This section provides two bases for modification: if Iowa no longer has jurisdiction or if Iowa has declined to exercise jurisdiction.
[59] Ante, pp 671-673.
[60] jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant. [28 USC 1738A(d).]
[61] 1738A(g).
[62] 1738A(f)(2).
[63] The natural parents signed consent to adoption forms three days after the birth of their daughter in October 1978. The mother appeared one week after signing the forms at the Ohio welfare department and orally revoked her surrender of the child. The department did not inform the Ohio juvenile court of the revocation, and the court approved the surrender and transfer of custody to the adoptive parents. Approximately two months later, in December 1978, the mother commenced a habeas corpus proceeding to obtain custody of her child.

After litigation in the lower courts of Ohio completed its course, the matter was taken up by the Ohio Supreme Court. That court concluded that the natural mother had timely revoked her surrender of the child. The adoptive parents filed a motion for rehearing, asserting that the court should have required a best interests hearing  as the adoptive parents had requested in the lower courts in Ohio  before deciding whether to order the child returned to the biological mother. The Ohio Supreme Court denied the motion.
The adoptive parents, who had moved to New Jersey during the course of the proceedings in Ohio, commenced a custody action in New Jersey on September 29, 1980. The New Jersey court assumed jurisdiction, conducted a best interests hearing, and ruled that it was in the child's best interests to remain with her adoptive parents. The biological mother appealed.
The New Jersey Supreme Court held:
To the extent jurisdiction continued in Ohio, if at all, the Ohio courts declined to exercise it by refusing to hold a best interest hearing. Because the child and adoptive parents resided in New Jersey for almost a year before commencing the New Jersey action, New Jersey was both the home state and the state with the most significant contacts to the controversy. Thus, under both the PKPA and UCCJA, New Jersey could modify the Ohio writ. [EEB, supra, p 611.]
[64] The biological mother voided her consent to an adoption. After the Ohio Supreme Court affirmed the lower court orders voiding the adoption, the biological mother brought an action in a West Virginia circuit court to compel the adoptive parents to turn the child over to her. The West Virginia Supreme Court ultimately ordered the West Virginia circuit court to enforce the Ohio decision.

On petition for rehearing brought by the adoptive parents, the West Virginia Supreme Court reaffirmed its earlier decision to accord full faith and credit to the Ohio judgment setting aside the adoption, but concluded "[w]e are not convinced, however, that it is in the best interests of Ryan Barr that his physical custody be changed at this time." The court remanded for proceedings in the circuit court to determine the child's best interests. Lemley, supra, p 382. No Ohio court had conducted a best interest hearing.
The court noted that the adoptive parents had "used all possible legal stratagems to avoid an unfavorable ruling in the Ohio courts, but at no time did they resort to self-help by fleeing or by refusing to follow a lawful court order." Id., p 385.
[65] Lemley differs from EEB in that the parents in Lemley did not ask the Ohio courts to conduct a best interests hearing.
[66] Id.
[67] 183 W Va 113; 394 SE2d 515 (1990). A Florida court had previously terminated the mother's rights.

The child was born in July 1982. The parents separated in September 1983, and, after 1985, the father had virtually no communication with the child until he was contacted by the state regarding the termination proceedings brought against the mother in September 1987.
A Florida court gave the maternal grandmother temporary physical custody. The Florida court subsequently ruled in December 1988 that the father was a fit custodian and awarded him legal and physical custody. This decision, the Brandon L E court noted, was reached although the father had shown little interest in the child. 183 W Va 115.
The grandmother, who by that time had moved to West Virginia, refused to recognize the Florida custody decree and filed for a writ of habeas corpus in a West Virginia circuit court.
The West Virginia Supreme Court held that it had jurisdiction to modify the Florida custody decree and remanded to the circuit court to determine whether the child's best interests required that the maternal grandmother retain custody.
[68] Id., p 121.
[69] See also Application of Felix, 116 Misc 2d 300; 455 NYS2d 234 (1982).
[70] See Van Houten v Van Houten, 156 AD2d 694; 549 NYS2d 452 (1989). A Florida court had awarded custody of the parties' two-year-old daughter to the mother in July, 1981. Shortly after the decree, the father snatched the child. For the next eight years, the mother attempted unsuccessfully to find her daughter. Upon tracking her down in New York, the mother filed a petition in New York, seeking enforcement of the Florida decree. The father petitioned for modification of the Florida decree, claiming that it was in the best interests of his daughter, who had been living with him for eight years, that custody be awarded to him.

The court wrote that even though state law forbids modification of a custody decree in child snatching cases: "We conclude that this is one of those rare instances where this imperative must be subordinated to the best interests of the child, and that the courts of this State should assume jurisdiction over the dispute."
In Owens, by and through, Mosley v Huffman, 481 So 2d 231 (Miss, 1985), the maternal grandmother challenged Mississippi's jurisdiction over a custody dispute. The grandmother had snatched the child, Christeen, from the child's mother, Huffman. The grandmother procured a custody decision in her favor in Texas.
The mother tracked the grandmother down after three years, but then stipulated to the grandmother's custody in an Arizona court, apparently because the mother's attorneys had misinformed her that if she contested custody she would never see her child again. When her daughter came to visit her in Mississippi, pursuant to the Arizona custody agreement, the mother filed for custody in Mississippi.
The Mississippi court assumed jurisdiction despite the Texas and Arizona decrees. The Mississippi court said:
We are not concerned with whether Mrs. Huffman as an individual might be precluded from relief, but whether her child is barred from any relief by a Mississippi court. Considerations of fairness and equity would impel us to say that the Chancery Court of Clay County should be able to proceed, because in the entire pathetic history of this child, the first opportunity she has ever had for a full-blown hearing for her own best interest is in that court. [Id., p 238.]
[71] Ante, p 670.
[72] Ante, p 670, n 24.
[73] 28 USC 1738A(c). See n 28 for text.
[74] See n 20.
[75] 441 Mich 23; 490 NW2d 568 (1992).
[76] Ante, pp 675-682.
[77] Ante, p 669, n 23.
[78] The UCCJA, §§ 2(5) and 3(a)(1), (2), contains these same tests. 9 ULA, part I, pp 124, 143-144.
[79] 28 USC 1738A(b)(4).
[80] 28 USC 1738A(b)(6).
[81] 28 USC 1738A(c)(2)(B)(ii).
[82] 28 USC 1738A(b)(2).
[83] Ante, p 683.
[84] MCL 722.21 et seq.; MSA 25.312(1) et seq.
[85] Ante, p 669, n 23.
[86] Bowie, supra, p 45.
[87] Ante, p 678.
[88] The Child Custody Act provides:

When the dispute is between the parents, between agencies or between third persons the best interests of the child shall control. When the dispute is between the parent or parents and an agency or a third person, it is presumed that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is established by clear and convincing evidence. [Child Custody Act, MCL 722.25; MSA 25.312(5).]
The Adoption Code provides:
In an adoption proceeding, the court shall direct a full investigation by an employee or agent of the court, a child placing agency, or the department. The following shall be considered in the investigation:
(a) The best interests of the adoptee. [MCL 710.46(1)(a); MSA 27.3178(555.46)(1)(a).]
The Probate Code provides that in foster care permanency planning decisions:
If the court determines at a permanency planning hearing that the child should not be returned to his or her parent, the agency shall initiate proceedings to terminate parental rights to the child not later than 42 days after the permanency planning hearing, unless the agency demonstrates to the court that initiating the termination of parental rights to the child is clearly not in the child's best interests. [MCL 712A.19a(5); MSA 27.3178(598.19a)(5).]
[89] MCL 710.39; MSA 27.3178(555.39).
[90] 1974 PA 296, MCL 710.21 et seq.; MSA 27.3178(555.21) et seq.
[91] This concept was in the 1974 act. The language was modified by subsequent legislation, but the meaning is essentially the same. Subsequent legislation also added a definition of "best interests":

(b) "Best interests of the adoptee" or "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court to be applied to give the adoptee permanence at the earliest possible date:
(i) The love, affection, and other emotional ties existing between the adopting person or persons or the putative father, and the adoptee.
(ii) The capacity and disposition of the adopting person or persons or the putative father to give the adoptee love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture of the adoptee.
(iii) The capacity and disposition of the adopting person or persons or the putative father to provide the adoptee with food, clothing, education, permanence, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.
(iv) The length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(v) The permanence as a family unit of the proposed adoptive home, or the home of the putative father.
(vi) The moral fitness of the adopting person or persons or of the putative father.
(vii) The mental and physical health of the adopting person or persons or of the putative father, and of the adoptee.
(viii) The home, school, and community record of the adoptee.
(ix) The reasonable preference of the adoptee, if the adoptee is 14 years of age or less and if the court deems the adoptee to be of sufficient age to express a preference.
(x) The ability and willingness of the adopting person or persons to adopt the adoptee's siblings.
(xi) Any other factor considered by the court to be relevant to a particular adoption proceeding, or to a putative father's request for child custody. [MCL 710.22; MSA 27.3178(555.22).]
[92] The majority's comment (ante, pp 677-678) on subsection (2) ignores the difference between a decision recognizing parental rights and a decision awarding custody.
[93] The Iowa Supreme Court said:

Daniel has had a poor performance record as a parent. He fathered two children prior to this child, a son, age fourteen, and a daughter born out of wedlock, now age twelve. The record shows that Daniel has largely failed to support these children financially and has failed to maintain meaningful contact with either of them.
[94] His opinion was as follows:

I respectfully dissent.
The evidence is sufficient to show abandonment of the baby by Daniel. The record shows he has previously failed to raise or support his other two children. He quit supporting his son, born in 1976, after two years. From 1978 to 1990 he saw him three times. He has another daughter whom he has never seen and has failed to support. He stated he just never took any interest in her. In every meaningful way, he abandoned them.
Daniel knew that Cara was pregnant in December 1990. He saw her in the building where they worked for the same employer. The child was born in February 1991. Having knowledge of the facts that support the likelihood that he was the biological father, nevertheless, he did nothing to protect his rights. The mother, Cara, who knew better than anyone who the father was, named Scott as the father. The legal proceedings logically and reasonably were based on these representations. The termination of parental rights as known to exist at the time were legally completed and an adoption process was commenced.
Daniel's sudden desire to assume parental responsibilities is a late claim to assumed rights that he forfeited by his indifferent conduct to the fate of Cara and her child. The specter of newly named genetic fathers, upsetting adoptions, perhaps years later, is an unconscionable result. Such a consequence is not driven by the language of our statutes, due process concerns or the facts of this case.
I would remand for termination of Daniel's parental rights based on abandonment and denial of Cara's motions. The intervention petition of Daniel in the adoption case should be dismissed on remand and the adoption proceed.
[95] Ante, pp 692-693.
[96] Ante, pp 655-656.
[97] This was not decided on remand. Instead of deciding that question, it was decided on remand from the Iowa Supreme Court that Cara Schmidt's parental rights should be restored because Daniel Schmidt's rights had been recognized and they had married.
[98] Recording statutes require persons claiming an interest in real property to provide notice of their interest  by a proper recording  or take subject to the interest of third persons who purchase in good faith and without notice of the prior interest. Similarly, the Uniform Commercial Code, e.g., §§ 9-301, 9-302, in cases involving personal property, requires secured creditors to give proper notice or to take subject to the rights of bona fide purchasers.

The law thus requires a person claiming an interest in property to assert it in a way that is plain and simple for the rest of the world to ascertain.
The DeBoers were misled by Cara Schmidt's fraudulent warranty. She identified to the DeBoers as the father of the child a person whom she knew was not the father. She allowed the DeBoers to take custody of the child knowing that the DeBoers, relying on her misrepresentation, had obtained a waiver of parental rights from the wrong person.
Daniel Schmidt, the real father  and thus the true owner for purposes of this property law analysis  enabled Cara Schmidt to perpetrate her fraud.
Under another property law analysis, estoppel, the law again places the loss on the least cost risk avoider, that is, the person who was in the best position to avoid the loss in the first place.
Under the doctrine of voidable title (see, e.g., UCC § 2-403), the true owner enables another to appear to be the true owner with the result that the rights of the true owner are subordinated to those of a bona fide purchaser who takes without actual notice of the prior interest. Daniel Schmidt enabled Cara Schmidt to appear to be the true owner of the child because he took no steps to assert his rights. He gave Cara Schmidt a voidable title, which, in the hands of an innocent purchaser, ripens into full title good against the world including the true owner.
[99] The Court reversed an award of temporary custody to the child's grandparents, despite a finding that this would be in the child's best interests. The Court held that the circuit court lacks authority to enter an order granting custody to a third party over the parents' objection where the child is living with the parents, no divorce or separate maintenance proceedings have been instituted, and there has been no finding of parental unfitness.
[100] The Court held that third parties do not have standing to petition for custody on the basis that the child resides or has resided with the third party, unless they are guardians or limited guardians or have a substantive right to custody.
[101] Senate substitute for HB 4064, passed Senate June 10, 1993.
[102] See, e.g., In re Ryman, 394 Mich 637; 232 NW2d 178 (1975); In re Seitz, 441 Mich 590; 495 NW2d 559 (1993).
[103] Michael H v Gerald D, 491 US 110; 109 S Ct 2333; 105 L Ed 2d 91 (1989); Stanley v Illinois, 405 US 645; 92 S Ct 1208; 31 L Ed 2d 551 (1972); Quilloin v Walcott, 434 US 246; 98 S Ct 549; 54 L Ed 2d 511 (1978); Caban v Mohammed, 441 US 380; 99 S Ct 1760; 60 L Ed 2d 297 (1979); Lehr v Robertson, 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983).

Cf. Reno v Flores, 507 US ___; 113 S Ct 1439; 123 L Ed 2d 1 (1993).
[104] Ante, p 657.
[105] MCL 722.24; MSA 25.312(4).